# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-4099

STEPHEN EZELL,

*Plaintiff-Appellant,*

v.

JOHN E. POTTER, Postmaster General,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 01 C 637—**Philip P. Simon,** *Judge.*

———————

ARGUED SEPTEMBER 10, 2004—DECIDED MARCH 16, 2005

———————

Before FLAUM, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Stephen Ezell, a longtime employee of the United States Postal Service, sued his employer for race, gender and age discrimination. He contended that he was treated in a disparate manner based on these prohibited factors and also that he was subject to a hostile environment. The district court granted summary judgment in favor of the Postal Service on all of the claims. We affirm in part and vacate and remand for further proceedings in part.

## I.

Ezell is a Caucasian man over the age of fifty. He has worked as a letter carrier for the Postal Service since 1972, and has worked in the Valparaiso, Indiana branch since 1988. Ezell's supervisor at the Postal Service during the events leading to this lawsuit was Tangela Wright, an African-American woman. Ezell had an uneasy relationship with Wright that culminated in the Postal Service issuing him a termination letter. According to Ezell, he had an unblemished record at the Postal Service until Wright became his supervisor. Ezell complains that Wright frequently made inappropriate and discriminatory comments based on race, gender and age. Ezell believes that Wright was motivated by race, gender and age in taking an adverse employment action against him based on the following incident.

On March 6, 2001, Ezell was on his route and stopped to buy his lunch at a Wendy's fast food restaurant. Coincidentally, Wright and Mike Pavlides, another Postal Service supervisor, were also out on the road that day and saw Ezell's mail truck parked at the Wendy's restaurant. The parties dispute the timing of events that day, but on summary judgment, we construe all reasonable inferences in favor of the party opposing judgment, in this case Ezell. According to Ezell, he purchased his lunch and returned to his truck promptly. He then drove across the street to a parking lot pay phone where he called his wife and spoke to her for approximately three minutes. He next headed to a convenience store to purchase a newspaper to read during his allotted half hour lunch break, drove to his route and parked his truck. He ate his lunch within the allowed time limit and then sorted the mail in his truck for deliveries to his own route and to an additional route he was covering that day. When he exited his truck to begin the deliveries, he saw that another Postal Service vehicle was parked behind him. As he approached the other vehicle, Wright and Pavlides emerged

and began "rifling" through Ezell's truck. They asked him questions about where he was on his route but made no mention of his taking an allegedly overextended lunch period. After inspecting Ezell's truck, Wright and Pavlides left the scene and Ezell continued to deliver the mail.

Six days later, on March 20, 2001, Ezell was called into the office for questioning by Wright and Postmaster David Dew. Ezell's union steward, Mike Daily, was also present for this meeting. Wright and Dew asked Ezell where he had lunch on March 14 and whether it was possible he had taken an extended lunch that day. When Ezell could not recall where he had lunched six days earlier, Wright and Dew treated him as if he were being uncooperative. On April 5, 2001, he was called back into the office and issued a "Notice of Removal" letter. The letter indicated he would be removed from the Postal Service on May 12, 2001, but could counter the termination by filing a grievance with the union steward. The letter, which was signed by both Wright and Dew, specified as the reason for the termination that Ezell had received pay for time not worked. The letter detailed the events of March 14, 2001, from the perspective of Wright and Pavlides. According to their version of Ezell's lunch break that day, Ezell exceeded his thirty minute lunch by another thirty minutes without informing his supervisor of this fact. The letter noted that Ezell received penalty overtime pay that day. According to the letter, Ezell admitted he knew the Postal Service policy on lunch breaks, could not recall the specific events of March 14, 2001, and conceded that he sometimes exceeded his lunch break without notifying management. Citing the Employee and Labor Relations Manual, Wright and Dew concluded that this was a dischargeable offense.

Ezell filed a grievance and won reinstatement. The Notice of Removal letter was withdrawn and in its place, the Postal Service issued a letter of warning. Ezell believed his termination was the result of race, gender and age discrimination by Wright and so on June 4, 2001, Ezell filed

a one page "EEO Complaint of Discrimination in the Postal Service." On the form, Ezell listed his supervisor, Tangela Wright, and Postmaster David Dew as the persons who allegedly engaged in discriminatory actions. In an area of the form titled "Type of Discrimination You Are Alleging," Ezell checked boxes for race, sex, age and retaliation. (He has since dropped his retaliation claim.) The other options available to allege the type of discrimination were color, religion, national origin and disability. Ezell left those boxes blank. For the "Date on Which Alleged Act(s) of Discrimination Took Place," Ezell wrote, "4-5-01." The form offered an opportunity to "[e]xplain the specific action(s) or situation(s) that resulted in you alleging that you believe you were discriminated against (treated differently than other employees or applicants) because of your race, color, religion, sex, age (40+), national origin, or disability." In the six lines allotted, Ezell wrote the following:

> Black, female supervisor has acted rude, disrespectful and confrontational toward me. She fabricated charges against me to have me fired. I am a white male 51 yrs. old. She has made racist, sexist remarks toward me. She has also made derogatory remarks about my age. I have also given statement in other EEO activities.

R. 2, Ex. A. In response to a question regarding what remedy he sought to resolve his complaint, Ezell specified, "To be made whole. The damage done to me cannot be undone. I want to be returned to the job I love and have performed for 28+ years." R. 2, Ex. A.

Ezell subsequently filed an EEO investigative affidavit further describing the basis of his complaint. R. 30, Ex 2. He again claimed discrimination on the basis of age, sex and race. He cited Tangela Wright as the person who discriminated against him and stated that she based the April 5, 2001 letter of removal on trumped-up charges. Ezell complained that Wright often made derogatory remarks

about older mail carriers in general and about him in particular, that she often referred to his gray hair and his slow work. He stated that Wright's co-supervisor, Mike Pavlides, told a new hire that their (Pavlides's and Wright's) plan was to get rid of older carriers and replace them with younger, faster carriers. Ezell complained that Wright was rude, disrespectful, dishonest, confrontational and racist. Ezell attributed a number of comments to Wright that he characterized as racist, although that meaning is not immediately apparent unless one is familiar with Ezell's view of the reputations of the Indiana towns of Gary and Valparaiso. Wright came from Gary, which Ezell characterizes as a primarily African-American city with a reputation for high crime rates. According to Ezell, Valparaiso, colloquially called "Valpo" by residents of Indiana, is primarily populated by Caucasians and has a reputation for a relatively low crime rate. The Valparaiso Post Office employed only a few African-American workers. Ezell reported that Wright threatened to take the Valparaiso workers to Gary for carrier training, taunting them with claims that they would not last a week. Wright complained about being stopped frequently by the police when driving in Valparaiso, and on one occasion, Ezell overheard Wright tell someone on the phone, "These people in Valpo think their shit don't stink." On another occasion, when a Caucasian man was shot and killed in Valparaiso, Wright stated in a joyful tone, "I didn't think there was any crime in Valpo."

Ezell also detailed what he considered to be evidence of Wright's sexism. Wright told the Valparaiso workers, for example, that women with children were faster carriers than men because they wanted to get home to their children. She said that men are lazy and "want to milk all the overtime they can get." Ezell complained that Wright gave favorable assignments to women in the office, and when he told her his feeling about this, she subjected him to "street supervision and intense scrutiny." Ezell also averred that

he "found it very uncomfortable to work in an environment where a supervisor is allowed to say, 'I'll fire every one of you mother fuckers and hire a whole new crew.'"

Ezell explained that Wright advised another employee to sequence mail in his truck, and then had Ezell fired for performing his job in that same manner. He contends he was sequencing mail in his truck on the day that Wright accused him of extending his lunch past the half-hour limit without adjusting his time card accordingly. That charge, of course, formed the basis for the Notice of Removal. In concluding his EEO affidavit, Ezell asked to "be made whole again, to have these wrongs righted." He characterized the treatment he had received as reprehensible and described his emotional distress as immeasurable. He complained that his reputation among his fellow employees and with the postal patrons he had served was "forever tarnished." He described himself as being under a doctor's care, requiring treatment until his life could be restored.

On the basis of his EEO claim and affidavit, the EEOC issued an Acceptance Letter notifying the parties it had received a complaint and that it was commencing an investigation. The Acceptance Letter listed "employment terminated" as the specific issue involved, and April 5, 2001 as the date of the incident. For types of discrimination alleged, the Acceptance Letter listed race (white), sex (male), age (DOB September 9, 1949), and retaliation.[1] If the recipient disagreed with the Letter, objections were required to be filed within seven days of receipt of the Letter. Ezell filed no objections and the claim investigator proceeded to treat the claim as one for employment termination only. The final agency decision was issued June 5, 2001. The agency

---

[1] Ezell did not appeal the district court's grant of summary judgment in favor of the defendants on his retaliation claim, and we will therefore not address it further.

found that Ezell failed to establish a *prima facie* case for race, gender, age or retaliatory discrimination, and also failed to demonstrate that the employer's stated reason for the termination was pretextual. His claim was thus denied.

Ezell then filed suit against the Postmaster General, claiming that he was subjected to harassment and discrimination based on race, gender, age and retaliation. The defendant moved for summary judgment. The district court granted judgment in favor of the Postal Service on all of Ezell's claims. The court found that Ezell failed to exhaust administrative remedies on his hostile environment claims. In the alternative, the court found that Wright's treatment of Ezell was not severe or pervasive enough to meet the standards for hostile environment claims. On his claims of disparate treatment, the court found first that Ezell failed to present sufficient direct evidence of race, gender or age discrimination, and also failed to make out a claim under the *McDonnell Douglas* burden-shifting method. In particular, the court found that Ezell failed to demonstrate that he had suffered an adverse action. The court concluded that the Letter of Warning issued after Ezell grieved his termination was insufficient to constitute an adverse employment action. Because the earlier-issued Notice of Removal was stayed pending resolution of Ezell's grievance, the court considered the Letter of Warning to be the only sanction imposed on Ezell. Under our case law, the court reasoned, such a sanction was insufficient to constitute an adverse employment action. Alternatively, the court found that Ezell failed to establish that other, similarly situated employees outside the protected class were treated better than he, or that the Postal Service's non-discriminatory explanation for its actions was pretextual. The court therefore granted summary judgment in favor of the Postal Service. Ezell appeals.

## II.

On appeal, Ezell contends that he sufficiently preserved his hostile environment claim in his original EEO complaint and that he presented enough evidence to proceed to trial on the merits of that claim. He also maintains that the Notice of Removal constituted an adverse employment action, that he presented adequate direct and indirect evidence of Wright's intent to discriminate against him based on race, gender and age, and that he produced sufficient evidence to demonstrate that the Postal Service's explanation for his discharge was pretextual. Our review is *de novo*. *Global Relief Found. v. New York Times Co.*, 390 F.3d 973, 981 (7th Cir. 2004). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Global Relief*, 390 F.3d at 981.

## A.

Before addressing Ezell's hostile environment claim on the merits, we consider first whether Ezell preserved the claim in his EEO complaint. "A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if her allegations fall within the scope of the earlier charges contained in the EEOC complaint." *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). In determining whether Ezell's current allegations fall within the scope of the earlier charges, we look to whether the allegations are like or reasonably related to those contained in the EEOC complaint. If they are, then we ask whether the current claim reasonably could have developed from the EEOC's investigation of the charges before it. *Cheek*, 97 F.3d at 202. Claims are reasonably related if there is a factual relation-

ship between them. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001). At a minimum, this means that the EEOC charge and the complaint must describe the same conduct and implicate the same individuals. *Kersting*, 250 F.3d at 1118. This limitation gives the employer some warning of the conduct about which the employee is aggrieved and affords the EEOC and the employer an opportunity to attempt conciliation without resort to the courts. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992).

Ezell's EEOC charge alleged race, sex and age discrimination, occurring on April 5, 2001, the date he was given the Notice of Removal Letter. In explaining the discriminatory action taken against him, he stated that his "Black, female supervisor has acted rude, disrespectful and confrontational toward" him. He complained that she made racist and sexist remarks toward him and also spoke in a derogatory fashion about his age. He also contended that Wright fabricated charges against him in order to have him fired. He asked to be made whole and to be returned to the job that he loved. The EEO investigator reviewing this charge apparently read it to be a complaint related solely to the termination of employment on April 5, 2001. In the Acceptance Letter, the investigator notified Ezell that the scope of the investigation was "employment terminated." The investigator directed Ezell that if he did not agree with the Acceptance Letter, he was required to provide his objections in writing within seven days.

Ezell did not expressly object to the scope of the investigation as set forth in the Acceptance Letter. He did not inform the investigator that Wright's conduct had created a hostile environment or that the offensive conduct occurred over a period of time exceeding the single date he specified, April 5, 2001. We recognize that employees often file an EEOC charge without the assistance of a lawyer and we therefore read the charge liberally. *Haugerud v. Amery*

*School District*, 259 F.3d 678, 689 (7th Cir. 2001). Again, to determine whether a claim raised in a complaint is within the scope of the earlier-filed EEOC charge, we ask what EEOC investigation could reasonably be expected to grow from the original charge. *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 527 (7th Cir. 2003). Ezell's EEOC charge is ambiguous when we view it in this light. Although he references a particular date for the discriminatory action and discusses his discharge, he also complains that his supervisor made racist, sexist and age-related comments to him and treated him in a rude, disrespectful and confrontational manner. He stated he was "uncomfortable" working in this "environment." These charges could suggest a hostile environment claim or could simply be evidence of Wright's discriminatory intent in having him fired. Moreover, in addition to asking for reinstatement, a remedy for termination, Ezell asks generally to be made whole and speaks of the emotional distress he has suffered as a result of Wright's conduct toward him. The emotional distress he suffered may be the result of being wrongfully terminated for a discriminatory reason or it may have been caused by exposure to a hostile environment. He could be attempting in a non-lawyerly way to raise a hostile environment claim. In any case, the EEOC investigator read the charge more narrowly, to be confined only to wrongful termination. The charge and the later claim for hostile environment describe the same conduct and the same individuals. *Cheek*, 97 F.3d at 202. Still, it is unclear to us (and it was unclear to the EEOC investigator) that Ezell was alleging a hostile environment claim in his EEOC charge. In both the charge and the later-filed affidavit, Ezell appears to be detailing Wright's discriminatory conduct and speech solely as evidentiary support for her discriminatory intent in having him fired. He does not appear to be making an additional claim of hostile environment.

But we need not conclusively answer this question because, in any event, the conduct that Ezell describes is not severe

or pervasive enough to qualify as a hostile environment. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000). To be actionable, harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Hostetler*, 218 F.3d at 806. "Whether the harassment rises to this level turns on a constellation of factors that include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hostetler*, 218 F.3d at 806-07. A plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003); *Hostetler*, 218 F.3d at 807. A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all of the circumstances. *Rogers*, 320 F.3d at 752; *Hostetler*, 218 F.3d at 807. It is subjectively hostile when the plaintiff actually perceives it as such. *Hostetler*, 218 F.3d at 807.

Wright's offensive conduct was confined to verbal outbursts and never became physically threatening. Ezell complains that she was rude to Caucasian employees and threatened to fire the whole crew and replace them. In contrast, she complimented African-American workers and treated them with respect. She commented in obtuse ways on the differences between Gary and Valparaiso. She suggested that men are slow workers who try to milk overtime and that women worked faster so that they could return home to their families. She also commented on the slowness of older workers and remarked on their gray hair. We have detailed her various other comments above and will not repeat them here. Ezell testified by affidavit that Wright made these kinds of remarks on a regular basis. Of course, a regular basis could be daily, weekly, monthly or even yearly; Ezell provides no detail on the regularity and so we

cannot consider the few comments detailed in the briefs to be pervasive. We then must consider whether they are "severe." Although these comments are rude and inappropriate, they are not so severe as to change the conditions of Ezell's employment. Wright's comments (and we assume for the purposes of summary judgment that she made the alleged comments) reflected some ignorant stereotypes of men, of older workers and of Caucasian workers but these are not the types of comments that render a workplace unworkable. *Compare Rogers*, 320 F.3d at 753 (offensive conduct not sufficiently severe where defendant made several sexually tinged comments to the plaintiff over a period of several months) *with Hostetler*, 218 F.3d at 807-08 (workplace hostile where plaintiff was twice subjected to unwelcome, forcible physical contact of an intimate nature and received an uninvited proposition for a sex act). Indeed, many of Wright's comments were not directed at Ezell personally but were simply made in his presence. We have characterized this "second-hand" harassment as lesser in impact than harassment directed at the plaintiff. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002); *Russell v. Board of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 343-44 (7th Cir. 2001). When it comes to racial or ethnic slurs, we have stated there is no magic number that constitutes a hostile environment. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002). Certain unambiguously racial epithets fall on the more "severe" end of the spectrum. *Cerros*, 288 F.3d at 1047. And we have noted that in the case of racial and ethnic slurs, some words are so outrageous that a single incident might qualify for a hostile environment claim. *Id*. At the same time, "a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Id*. What is alleged here is neither severe nor pervasive. *See Patt v. Family Health Systems, Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight offensive gender-based comments over the course of several years were too isolated and sporadic

to constitute severe or pervasive harassment); *Russell*, 243 F.3d at 343 (where statements directed to plaintiff were few and far between, were not physically intimidating or threatening, were not sexually suggestive but were merely offensive, statements did not constitute actionable conduct under hostile environment theory). For that reason alone, the court was correct to grant judgment in favor of the Postmaster on Ezell's hostile environment claim.

## B.

The district court granted judgment in favor of the Postmaster on Ezell's disparate treatment claims because the court believed Ezell could not demonstrate that his employer had taken an adverse employment action against him. The Removal Letter was withdrawn before it ever took effect as a result of Ezell's challenge to his termination through the union grievance procedure. The court found that the resulting letter of warning was insufficient to constitute an adverse employment action. Our review here is again *de novo*. *Global Relief*, 390 F.3d at 981. The court was correct that a letter of warning is generally considered insufficient to qualify as an adverse employment action. *See Krause v. City of LaCrosse*, 246 F.3d 995, 1000 (7th Cir. 2001); *Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998).

The Removal Letter, however, did constitute an adverse employment action even though it was later withdrawn. *See Molnar v. Booth*, 229 F.3d 593, 600-01 (7th Cir. 2000). In *Molnar*, we found that a career-ending negative evaluation was an adverse employment action even though the evaluation was reversed six months later and the plaintiff's career was put back on track. *Molnar*, 229 F.3d at 600. We reasoned that to hold otherwise would allow harassing supervisors to demote employees who rejected their advances with impunity, so long as they later reversed the demotion

and restored the employees to their former positions. *Molnar*, 229 F.3d at 600-01. We noted that the short duration of the adverse action was naturally relevant to the degree of damage the plaintiff suffered, and that principle would apply here as well. The Removal Letter damaged Ezell from the time it was issued until it was reversed through the union grievance process. Ezell's damages may be relatively modest but the Removal Letter constituted an adverse employment action.

The district court held in the alternative that Ezell's discrimination claims could not survive summary judgment because (1) he did not have sufficient direct evidence of discriminatory intent; (2) he failed to create a genuine issue of material fact on the fourth prong of the *McDonnell Douglas* burden-shifting test; and (3) he could not show that the Postmaster's stated non-discriminatory reason for his termination was pretext. In the summary judgment context, a plaintiff may meet the fourth prong of the *McDonnell Douglas prima facie* case by demonstrating a genuine issue of material fact on whether he was treated less favorably than similarly situated employees outside of his protected class. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). The district court found here that Ezell had failed to produce evidence of any employee outside his class who was similarly situated. In particular, the district court found that the other employees cited by Ezell had engaged in different misconduct and thus were not similarly situated. One employee had lost a piece of certified mail and was not disciplined for this offense. Another had altered time records in violation of the Fair Labor Standards Act without punishment. Because neither of these employees had made a claim for pay during a time when they were not actually working, the court found they were too dissimilar as a matter of law.

In determining whether employees are similarly situated, we must look at all relevant factors, the number of which

depends on the context of the case. *Peele*, 288 F.3d at 330. In disciplinary cases, those cases in which the plaintiff claims he or she was disciplined more harshly than another employee based on a prohibited reason, the plaintiff must show that he or she is similarly situated with respect to performance, qualifications and conduct. *Peele*, 288 F.3d at 330.

> This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Peele*, 288 F.3d at 330 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). The district court took this to mean that Ezell must produce a non-Caucasian employee who committed exactly the same infraction and was treated more favorably. But the law is not this narrow; the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated.

With those standards in mind, we will examine Ezell's evidence of similarly situated co-workers. On Ezell's race claim, he cites the case of Matt Walker, an African-American employee who lost a piece of certified or registered mail and was not disciplined for this offense. The Postmaster characterizes Ezell's claim that losing mail is a serious offense as "self-serving" and states there is no evidence that losing certified mail is considered a serious matter. This is a curious claim from an entity whose primary business is delivering mail. Misplacing certified mail, that is, mail that has been designated as especially important by its sender, would seem to be a serious matter. Ezell points out evidence in the record that another carrier was fired for delaying mail and from this termination we may infer that

losing mail would also be a serious offense, at least as serious as taking a long lunch. Ezell thus has raised a genuine issue of material fact as to whether a similarly situated employee outside his class received favorable treatment.

Additionally, Ezell has produced evidence that Wright herself doctored the time records of other employees. According to Joan Hoptowit, Wright disallowed overtime for carriers by asking a timekeeper to change computer records to eliminate previously approved overtime. According to Hoptowit, this practice amounted to falsifying records and violated the Fair Labor Standards Act. Yet Wright was never disciplined much less terminated for this conduct. Some of the affected employees brought grievances in order to have their overtime restored, and even following these successful grievances, Wright was not disciplined. This offense is arguably very similar to the conduct which led to Ezell's termination, so again, he has sufficient evidence to survive summary judgment on this prong of the burden-shifting test for his race and sex claims.

The Postmaster insists that even if Ezell clears this hurdle, he has not shown that the defendant's purported non-discriminatory reason for firing him is pretext. But here again Ezell has sufficient evidence to survive summary judgment. Although Wright's prejudicial comments were insufficient to make out a hostile environment claim, they are certainly sufficient to show that she may have been motivated by race and gender (we will get to age in a moment) when she made the case to have Ezell terminated. The defendant argues that Postmaster Dew, who was the final decision-maker on Ezell's fate, genuinely believed the non-discriminatory reason given to justify the termination. But Postmaster Dew relied largely on Wright's recommendation in deciding to terminate Ezell. In the case of termination, which is a tangible employment action, actions taken by a supervisor become, for Title VII purposes, the actions of the employer. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742,

762-63 (1998). *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998) (no affirmative defense is available to an employer in a sexual harassment case when the supervisor's harassment culminates in a tangible employment action such as discharge, demotion or undesirable reassignment). Because Dew relied on the advice of a supervisor who was arguably motivated by racial and gender bias, Ezell's race and gender claims survive summary judgment.

On his age claim, Ezell does not need the assistance of the burden-shifting test for he produced direct evidence of his supervisor's discriminatory intent. Wright's co-supervisor, Mike Pavlides, told a new hire that their (Pavlides's and Wright's) plan was to get rid of older carriers and replace them with younger, faster carriers. Wright also frequently made disparaging remarks about older workers, referred often to Ezell's gray hair and beard, commented on his slowness and suggested that because of his speed, he should consider another line of work. Pavlides's statement that he and Wright had a plan to get rid of older workers and replace them with younger, faster workers is direct evidence of discriminatory intent and is sufficient evidence to allow Ezell to take his case to trial. Direct evidence is evidence which can be interpreted as an acknowledgment of the defendant's discriminatory intent. *Wichmann v. Board of Trustees of Souther Illinois University*, 180 F.3d 791, 801 (7th Cir. 1999), *vacated and remanded on other grounds*, 528 U.S. 1111 (2000); *Kormoczy v. HUD*, 53 F.3d 821, 824 (7th Cir. 1995). To constitute direct evidence of discrimination, a statement must relate to the motivation of the decision-maker responsible for the contested decision. *Wichmann*, 180 F.3d at 801; *Rothman v. Emory University*, 123 F.3d 446, 451 (7th Cir. 1997). Again, Postmaster Dew accepted the recommendation of Wright and Pavlides in deciding to terminate Ezell and therefore the supervisors' discriminatory motive may be imputed to Dew. *See Hunt v.*

*City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) (when the decision-makers themselves, or those who provide input into the decision, express such discriminatory feelings around the time of, and in reference to, the adverse employment action complained of, then it may be possible to infer that the decision-makers were influenced by those feelings in making their decision). In *Wichmann*, we found direct evidence of discriminatory intent in the statement, "Think of it like this. In a forest you have to cut down the old, big trees so the little trees underneath can grow." *Wichmann*, 180 F.3d at 801. Ezell has produced evidence that Wright and Pavlides had a plan to eliminate older workers because they believed they were slower than younger workers. Wright frequently commented on Ezell's gray hair and slow speed. He may therefore take that claim to a jury.

## III.

Ezell has not presented sufficient evidence to sustain a hostile environment claim and we therefore affirm judgment in favor of the defendant on that claim. But for the reasons we have stated above, Ezell's race, sex and age claims are sufficiently supported to survive summary judgment and we therefore vacate that part of the judgment and remand for further proceedings. Ezell's damages may be modest but he may take these claims to trial.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

No. 03-4099 19

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—3-16-05