In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2961

AUDREY GOODWIN,

*Plaintiff-Appellant,*

*v.*

THE BOARD OF TRUSTEES OF THE UNIVERSITY
OF ILLINOIS; and RANDY KORNEGAY and
KIP MECUM, in their individual capacities,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 2026—**Michael P. McCuskey**, *Chief Judge.*

ARGUED FEBRUARY 22, 2006—DECIDED MARCH 31, 2006

Before FLAUM, *Chief Judge*, and WILLIAMS and SYKES, *Circuit Judges*.

FLAUM, *Chief Judge.* Audrey Goodwin, a building service worker foreman for the University of Illinois at Urbana-Champaign, claims that she was demoted as a result of unlawful race- and sex-based discrimination. She has sued the Board of Trustees of the University of Illinois under Title VII and the supervisors who she claims demoted her under 42 U.S.C. § 1983. The district court granted summary judgment to the defendants on all counts. Goodwin now appeals. Because we conclude that Goodwin

has successfully established a *prima facie* case under *McDonnell Douglas* indirect method of proof and has created a genuine issue of fact as to whether the University's proffered reasons for her demotion were pretextual, we reverse the district court's summary judgment ruling and remand for further proceedings consistent with this opinion.

## I. Background

Audrey Goodwin is a black female. She has worked for the University of Illinois at Urbana-Champaign since 1978, first as a building service worker ("BSW") and then as a BSW foreman. During the time period relevant to this lawsuit, Goodwin's supervisors included Randy Kornegay, the superintendent of building services, and Kip Mecum, the director of operations and transportation services. Kornegay is a black male, and Mecum is a white male. Goodwin's immediate supervisor was Charles Hassell, the assistant superintendent of the day shift.

From the time she was hired until 1998, Goodwin worked "deep nights," first as a BSW and then as a BSW foreman. Her supervisors, including Kornegay and Mecum, eventually promoted her to the day shift as foreman of the moving crew. Goodwin claims that throughout her tenure at the University, her work record was well-regarded before January 2002—a claim that the defendants do not dispute on appeal.

The events leading to this lawsuit began on January 17, 2002, in Goodwin's office. Goodwin's office was located in the corner of a large space dedicated to the moving crew. It contained the time clock for the BSWs, and, every day at the beginning and end of each shift, the BSWs and the truck drivers who reported to Goodwin would clock in and out there. Near the end of her shift, Goodwin was checking her e-mail while employees were waiting to clock out. The

employees in the vicinity of Goodwin's desk were James Gillin, Elijah Green, Jack Hall, Jim McConkey, Donna Rokos, and Donald Wisehart. Goodwin opened an e-mail that had been sent to her university e-mail account. The e-mail contained an image of at least three scantily-clad women, each weighing over 1,000 pounds, eating. Their naked breasts were resting on a table.

Goodwin claims that when she saw this e-mail, she made an involuntary exclamation in the nature of "That's so terrible!" She claims that she was then distracted by a work-related phone call and left the image on the screen as she spoke on the telephone. As she was attending to business, she claims that the employees around her office, whose curiosity had been aroused by her exclamation, walked around her desk and looked at the image on her computer screen.

The defendants claim that Goodwin's "involuntary exclamation" was actually a comment intended to draw the employees' attention to the image, and that she turned the computer screen around so that the employees could better view the picture. The defendants also claim that three of the employees, Hall, Rokos, and Wisehart, heard Goodwin comment that if her breasts were that big, she would cut them off. Only one employee, Rokos, claims to have been offended by the picture.

Rokos reported the incident to Ron Burwell, a transportation foreman. Both Burwell and Rokos had previously complained about Goodwin in her capacity as a manager. Burwell advised Rokos to file a complaint against Goodwin. The next day, Rokos contacted Goodwin's immediate supervisor, Charles Hassell, and set up a meeting for the next day.

Goodwin claims that Hassell called her the day after the incident, January 18, and asked if she knew why Rokos

No. 05-2961

wanted to see him. Goodwin claims that after thinking about what might have prompted Rokos's request, she told Hassell about the e-mail incident. According to Goodwin, she was honest about the contents of the e-mail, and after she finished telling Hassell about the incident, he replied, "That's not so bad." Hassell has testified that he does not recall this conversation.

Hassell and Rokos met as planned on January 18, and after the meeting, Hassell discussed the incident with his supervisor, Kornegay. Kornegay and Hassell decided that it would be necessary to conduct an investigation.

On January 24, Goodwin met with Hassell and Tracy Osby, the department's public functions supervisor. During this meeting, Goodwin admitted that she had received the vulgar e-mail, denied that she had invited others to look at it, and was given a paper with the heading "E-Mail Etiquette." Goodwin testified that Hassell told her that he believed that she likely drew attention to the e-mail through an involuntary exclamation or gesture, and asked her to try to control her emotions better. Goodwin also testified that at the end of that meeting, she asked, "Is that it?" and Hassell replied, "Yes." Goodwin claims that at the close of the meeting, she was under the impression that the matter had been resolved.

The defendants claim that on January 25, Goodwin approached James Gillin, one of the employees under her supervision who was present during the e-mail incident. They allege that Goodwin asked Gillin if he had seen the e-mail picture. When he responded that he had, Goodwin allegedly told him that if he told supervisors that he had seen it, "it would hurt [him] in the long run in trying to become a supervisor or foreman or anything." According to the defendants, Gillin told Rokos and another BSW, Donald Wisehart, about Goodwin's comment on the same day.

As part of their investigation into the incident, Hassell, Kornegay, and Osby interviewed Rokos, Hall, Gillin, Green, and McConkey regarding the incident on January 17. During her interview, Rokos informed Kornegay that she believed that Goodwin had threatened Gillin. Kornegay asked Gillin about these alleged threats during his interview. Gillin agreed that Goodwin had told him to deny that the e-mail incident occurred if he was interested in advancing within the department.

Throughout the proceedings in this case, Goodwin has denied mentioning the e-mail incident to Gillin or threatening him in any way. She claims that Gillin did not discuss any desire to be promoted with her until after January 25, and that even if he had, she would not have been in a position to make recommendations or decisions about promotions. She points out that by the time the alleged intimidation occurred, she had already voluntarily discussed what happened on January 17 during the meeting on January 24 with Hassell and Osby and, she claims, when Hassell called her to discuss the reason that Rokos had requested a meeting. In addition, she has testified that by the date that Gillin alleges that she intimidated him, she believed that the entire matter had been resolved. She notes that Gillin had already been disciplined for lying to supervisors at the time he made these accusations, and that Gillin could not name the date of the alleged intimidation until he consulted with Rokos and another personnel service employee.

Goodwin claims that as part of Hassell and Kornegay's investigation, Hassell came to her office in early February to see if he could locate the vulgar e-mail in her computer's deleted e-mail folder. Goodwin alleges that Hassell told her that it was rumored that she was "trying to be more than what [she was.]" She testified that she then asked Hassell what she was doing wrong. She claims that Hassell replied, "People don't like you because, historically,

this is a white male position. You are a strong black female, and people don't like that. You dress profession[ally], you are strict and you enforce the rules, and people don't like that." Hassell testified that he does not remember making that statement and, in response to a leading question, testified that he "would not make that kind of statement."

Kornegay testified that he believed Gillin's intimidation accusation was credible. He initiated a pre-disciplinary meeting with Goodwin. Two pre-disciplinary meetings were held during the month of February. On March 8, 2002, Kornegay signed and delivered to Goodwin an intent to file notice of demotion. The same day, he placed Goodwin on administrative leave with pay. On March 13, a civil service reconciliation meeting was held, but nevertheless, Goodwin was demoted effective March 15, 2002. The reasons given for the demotion were abuse of authority, intimidation of an employee to withhold or misrepresent information, which creates a hostile work environment, and poor judgment/conduct unbecoming a supervisor.

The parties dispute who was responsible for the decision to demote Goodwin. All parties agree that Kornegay was involved, but Goodwin claims that Kip Mecum could have overridden Kornegay's decision. The defendants claim that Kornegay was solely responsible for the demotion and that, although Kornegay did consult Mecum when deciding whether to demote Goodwin, Kornegay had the final authority in the matter. Although neither party claims that Hassell had the authority to demote Goodwin, Goodwin claims that Hassell was integral to Kornegay's investigation and that he recommended that Kornegay demote Goodwin.

Goodwin filed a grievance with the State University Civil Service System. A hearing officer conducted an administrative hearing on April 24, 2002. On May 31, 2002, the hearing officer issued his findings of fact. The hearing officer found that Gillin's intimidation claim was not

credible, that Goodwin had made an involuntary exclamation when she viewed the e-mail, and that the employees needed to walk around Goodwin's desk to view the image; the hearing officer further stated that the incident had been "blown totally out of proportion." On September 18, 2002, the University Civil Service Merit Board ("the Merit Board") issued a final decision and order. The Merit Board determined that the University had failed to establish just cause for Goodwin's demotion and ordered that she be immediately reassigned to perform the duties of her former classification without loss of compensation.

Goodwin was reinstated to BSW Foreman by the end of September, and received the difference in pay between a BSW and a BSW Foreman for the period of her demotion. Although Goodwin received her former title of BSW Foreman, her position changed from foreman of the moving crew to foreman of the cleaning crew. Her job was later reclassified as an office job, and she no longer directly supervises BSWs. The defendants claim that the latter job switch was because the University was concerned that the union was targeting Goodwin, and so she was moved for her own well-being. Goodwin complains that neither of the new job assignments provides the same opportunities for overtime pay as her old job; she argues that she loses $10,000 to $15,000 per year in overtime pay. She also claims that the cleaning crew position was not as prestigious as the moving crew position.

The defendants have produced no evidence that any other employee has ever been disciplined for receiving personal e-mail or vulgar e-mail. Goodwin has identified three employees whom she considers to be similarly situated to herself, and who had not received as severe a punishment for what she believes to be similar offenses. Those employees, their offenses, and their punishments will be discussed below with more specificity.

In February 2004, Goodwin filed suit against the Board of Trustees of the University of Illinois ("the University"), Kornegay, and Mecum, alleging that the University had discriminated against her on the basis of her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and that Mecum and Kornegay had denied her right to equal protection of the law in violation of § 1983 of the Civil Rights Act of 1865, 42 U.S.C. § 1983 ("§ 1983"). The district court dismissed the age discrimination claim, finding it barred by the Eleventh Amendment, in August 2004. That decision is not appealed.

At issue in this case is the district court's July 2005 grant of summary judgment to the defendants on the Title VII and § 1983 claims. The district court reasoned that because Goodwin had not alleged direct or circumstantial evidence of discrimination, and had failed to indirectly prove discrimination using the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the defendants were entitled to judgment as a matter of law. Goodwin now appeals that decision, claiming that she has proven discrimination through direct or circumstantial evidence, and that she has also indirectly proven discrimination through the *McDonnell Douglas* indirect burden-shifting method.

## II. Discussion

### A. *McDonnell Douglas* analysis

In order to indirectly establish proof of discrimination in her Title VII claim, Goodwin must first establish the *prima facie* elements set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Those elements are: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment

action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002).

If Goodwin successfully establishes each element of the *prima facie* case, the burden shifts to the University to assert a legitimate, nondiscriminatory reason for the challenged action. *Simmons v. Chi. Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002). If it does so, the burden then shifts back to Goodwin to present evidence that would allow the trier of fact to conclude that the University's proffered reason is pretextual. *Id.* This method can also be used to establish discrimination for the § 1983 action against Kornegay and Mecum. *Friedel v. City of Madison*, 832 F.2d 965, 971-72 (7th Cir. 1987) (citing *Am. Nurses Assoc. v. State of Ill.*, 783 F.2d 716, 722-23 (7th Cir. 1986); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986); *Ramsey v. Am. Air Filter Co.,* 772 F.2d 1303, 1307 (7th Cir. 1985)).

The district court ruled that Goodwin did not meet the fourth prong of the *McDonnell Douglas* test because she did not show a similarly situated individual outside of her protected class who was not disciplined as severely. Although Goodwin suggested three individuals that she believed satisfied this prong of the test, the district court found that each was distinguishable.

First, Goodwin offered defendant Mecum himself as a similarly situated employee. Mecum admitted that he had received vulgar jokes on his university e-mail account. Goodwin notes that he has never been demoted. We agree with the district court that Mecum is not similarly situated to Goodwin. Mecum was in a more senior position, and thus did not "deal with the same supervisor" as Goodwin. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)); *see also Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 940 (7th Cir. 2003). Assuming at this point

that Mecum was involved in the decision to demote Goodwin, which we must since that is what Goodwin herself alleges in her § 1983 claim against him, Goodwin can argue at best that Mecum was hypocritical in not disciplining himself for similar conduct.

Goodwin next suggests that Charles Elder, a white male BSW, is a similarly situated individual who was treated more favorably. Elder was caught using university computers to access pornography on the internet. He received only a letter of warning for his conduct. The district court ruled that Elder was not similarly situated because he was not a supervisor and had not been accused of showing the pornography to other co-workers.

Goodwin cites this court's opinion in *Ezell v. Potter,* 400 F.3d 1041 (7th Cir. 2005), to support her position that Elder is similarly situated. In that case, a postal worker who lost certified mail was deemed similarly situated to the plaintiff, who was accused of taking a long lunch hour. The panel dismissed the postal service's claim that the plaintiff had not produced evidence to show that misplacing mail was a "serious matter." The court reasoned, "This is a curious claim from an entity whose primary business is delivering mail. Misplacing certified mail, that is, mail that has been designated as especially important by its sender, would seem to be a serious matter. . . . [W]e may infer [from the termination of another employee for merely delaying mail] that losing mail would . . . be a serious offense, at least as serious as taking a long lunch." *Ezell*, 400 F.3d at 1050.

Here, however, it is not so obvious that accessing pornography affected Elder's job performance that we may "infer that [it] would . . . be a serious offense." We believe that this case is distinguishable from *Ezell,* as accessing pornography has nothing to do with the University's "primary business." The University could quite legitimately believe that allowing subordinate employees to see a vulgar image negatively

affects job performance much more than accessing such an image in private. Moreover, unlike *Ezell*, the record does not reflect that another employee was terminated for a similar offense. Like the district court, we also do not believe that Elder and Goodwin are similarly situated.

We are, however, persuaded that Ray Northway, the final employee that Goodwin has proffered, is similarly situated to Goodwin within the meaning of the *McDonnell Douglas* test. Northway, a white, male BSW foreman, threw a bottle cap at a female BSW foreman and told her to "shove it up [her] ass." He received a written letter of warning, but was not demoted. The district court found that Northway was not similarly situated to Goodwin because the incident had occurred during a heated argument and did not involve an adverse interaction with one of the employees that Northway supervised.

With respect to this individual, we respectfully disagree with the district court's analysis. While it is true that Northway's conduct involved insulting a co-worker who was not under his supervision, we believe that requiring Goodwin to show a supervisor/supervisee interaction in order to satisfy the *McDonnell Douglas* test would be applying the indirect method of proof too narrowly. As we stated in *Ezell*, "the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated." *Ezell*, 400 F.3d at 1050. We believe that Northway's comment was both vulgar and potentially threatening, which is the essence of the charges against Goodwin. Although the two situations are not identical, they are sufficiently similar, which is all that *McDonnell Douglas* requires.

Because the district court did not address the other prongs of the *McDonnell Douglas* test, we will briefly do so here. It is undisputed that Goodwin meets the first prong, as she is a black female. And although the Univer-

sity makes a brief argument that Goodwin did not suffer an adverse employment action, a demotion, even if it is later rescinded, clearly meets the third prong of the test. *See Ezell*, 400 F.3d at 1049; *Molnar v. Booth*, 229 F.3d 593, 600-01 (7th Cir. 2000).

Defendants also briefly argue that Goodwin was not meeting her employer's legitimate expectations because of her actions on January 17, 2002, and that she therefore fails the second prong of the *McDonnell Douglas* test. This argument assumes its conclusion. The entire purpose of the *McDonnell Douglas* test is to determine whether the action in question was a legitimate reason for demotion. Goodwin had a satisfactory work record before January 17, 2002, which is the relevant time frame here. She has met all prongs of the *McDonnell Douglas* test and has successfully shifted the burden of showing legitimate, nondiscriminatory reasons for her demotion onto the University.

Naturally, the University has argued that Goodwin's conduct in January 2002, i.e., showing University employees a vulgar e-mail and threatening an employee under her direct supervision, was a legitimate, nondiscriminatory reason to demote her. The burden is then shifted back to Goodwin to show that this reason is merely a pretext, and that her demotion was actually prompted by discriminatory motives.

We conclude that Goodwin has created a material issue of fact as to whether the e-mail incident and Gillin's allegation that Goodwin threatened him were pretextual reasons for her demotion. The strongest evidence of pretext is Hassell's alleged statement that she was "trying to be more than what [she is]" and that "people" didn't like her because she was a strong black female. Although Hassell was not the final decisionmaker in her demotion, he was involved with Kornegay's investigation into the e-mail incident, and Kornegay has admitted consulting with Hassell before

making his decision to demote. A race-based comment by a person close to the decisionmaking process can be thought suspect, though it is not dispositive.

Adding to Goodwin's pretext argument are the circumstances surrounding Gillin's accusation. Gillin had already been disciplined for lying to supervisors, and the substance of his allegation is questionable. Arguably, Goodwin, who had already admitted that the incident occurred and believed that her "punishment" was a light talking-to and a handout called "E-mail Etiquette," would not risk her job to keep Gillin from discussing the incident.[1] Further, if Kornegay actually believed Gillin, the question arises why he did not ask other employees if they had been similarly threatened. Questions such as these apparently led the Merit Board hearing officer, viewing the evidence as a whole, to specifically find that Gillin's allegations were not credible. It is reasonable to assume that a jury might conclude that Kornegay similarly doubted Gillin's veracity. This goes to the heart of Goodwin's pretext argument. It is our judgment that Goodwin has raised a material issue of fact regarding Kornegay's subjective belief in Gillin's allegations.

## B.  Collateral estoppel

Having decided that Goodwin's claims can be tried under the *McDonnell Douglas* standard, the question remains whether the defendants have been collaterally estopped from arguing during trial facts that are inconsistent with the Merit Board hearing officer's findings of fact. Goodwin argues that the defendants should not be allowed

---

[1] We are viewing the evidence in the light most favorable to Goodwin when making this assessment, as we must at the summary judgment stage of the proceedings.

to re-litigate the hearing officer's findings of fact, including that the allegations against Goodwin were incredible. Because we believe that this issue could affect the way the pretext dispute plays out at trial, we will address it.

In *University of Tennessee v. Elliott*, 478 U.S. 788, 797-99 (1986), the Supreme Court held that in § 1983 claims, state administrative factfinding should be given preclusive effect on subsequent federal proceedings. The Court held that "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Elliott,* 478 U.S. at 799 (internal quotation marks and citations omitted).

We believe that the Merit Board was acting in a judicial capacity. The Merit Board was created by Illinois law, 110 ILL. COMP. STAT. 70/36o, and is subject to the Illinois Administrative Review Law, 735 ILL. COMP. STAT. 5/3-101-5/3-113. A hearing officer presided over an administrative hearing, during which counsel questioned and cross-examined witnesses who were under oath. At the conclusion of the hearing, the hearing officer issued findings of fact. The Merit Board issued a final decision and order thereafter. Therefore, our inquiry must focus on whether Illinois courts would deem the Merit Board hearing officer's factfinding or the Merit Board's final order to be issue-preclusive in the current cause of action.

Under Illinois law, "fact issues finally decided in an administrative proceeding that is judicial in nature precludes litigation of those same fact issues in a subsequent proceeding." *Vill. of Oak Park v. Ill. Dep't of Employment Sec.*, 772 N.E.2d 951, 953 (Ill. App. 2002) (citing *Osborne v. Kelly*, 565 N.E.2d 1340 (Ill. App. 1991)). Collateral estoppel, also known as issue preclusion, applies when: (1) a material

fact issue decided in the earlier adjudication is identical to the one in the current proceeding; (2) there was a final judgment on the merits in the earlier adjudication; and (3) the party against whom estoppel is asserted was a party or was in privity with a party in the earlier adjudication. *Id.* at 953 (citing *Midland Hotel Corp. v. Dir. of Employment Sec.*, 668 N.E.2d 82 (Ill. App. 1996)); *Gumma v. White,* 833 N.E.2d 834, 843 (Ill. 2005); *Am. Family Mut. Ins. Co. v. Savickas*, 739 N.E.2d 445, 451 (Ill. 2000).

Even if these threshold requirements are met, the doctrine should not be applied unless it is clear that no unfairness will result to the party that would be estopped from re-litigating the issue. *Savickas*, 739 N.E.2d at 451. In determining whether unfairness results, courts should look to the party's incentive to litigate the issue in the prior action. *Id.*; *see also Talarico v. Dunlap*, 685 N.E.2d 325 (Ill. 1997) (holding that criminal guilty plea did not collaterally estop civil claim issue that medication caused criminal defendant to commit the crime, because defendant did not have motivation to argue that issue during the criminal proceedings).

In this case, the hearing officer decided material issues of fact. Namely, the hearing officer found that Gillin's accusations were not credible and that Goodwin had not, as defendants claim, intentionally shown the vulgar e-mail to the employees near her office. These facts are relevant to the pretext inquiry under *McDonnell Douglas.*

However, we conclude that the hearing officer's findings of fact cannot constitute a final decision by the Merit Board. The hearing officer's findings of fact were entered on May 31, 2002. Goodwin has not argued, nor have we found, any statutory authority that binds the Merit Board to the hearing officer's findings of fact.

In contrast, the "Decision and Order" of the Merit Board, dated September 18, 2002, is a final order, yet it did

not incorporate the hearing officer's findings of fact. It merely held that the proceeding had been conducted in compliance with Illinois law, that the Merit Board had jurisdiction over the matter, that the "transcript of evidence and Hearing Record" did not "support and sustain charges of the Employer," and that "said Employer has failed to establish just cause for demotion." Although the issue of whether the evidence "supported and sustained the charges of the Employer" is *similar* to the issues addressed in the *McDonnell Douglas* pretext argument and the hearing officer's findings of fact, they are not *identical*, as required for collateral estoppel to apply. Therefore, collateral estoppel stemming from either stage of the Merit Board proceedings is inappropriate, and Goodwin's argument fails.

Goodwin has also sued under Title VII, but, as we stated in *Buckhalter v. Pepsi-Cola Gen. Bottlers, Inc.*, 820 F.2d 892 (7th Cir. 1987),

> [G]eneral rules of preclusion bar relitigation of administrative fact finding unless there is Congressional intent to the contrary. The court in *Elliott* analyzed Title VII and the history of the 1972 amendments and found that Congress intended that employees have the right to trial *de novo* following administrative proceedings when contesting a discharge under Title VII[.]

*Buckhalter*, 820 F.2d at 894; *see also Richmond v. St. Joseph Care Center West*, 190 F.3d 500 (7th Cir. 1999). With Goodwin unable to prevail on her collateral estoppel argument regarding her § 1983 claim, so too she cannot succeed in the same regard with her Title VII claim.

Thus, the proceedings before the Merit Board have not collaterally estopped defendants from arguing any issue at trial.

## III. Conclusion

We REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—3-31-06