NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted June 11, 2008[*]
Decided June 12, 2008

**Before**

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 07-1814

CAROLYN BOTTOMS,
    *Plaintiff-Appellant*,

    *v.*

ILLINOIS DEPARTMENT OF HUMAN
SERVICES and CHICAGO-READ
MENTAL HEALTH CENTER,
    *Defendants-Appellees.*

Appeal from the United States District
Court for the Northern District of Illinois,
Eastern Division.

No. 03 C 1881

Virginia M. Kendall,
*Judge.*

**O R D E R**

Carolyn Bottoms was fired from her job as an office assistant at the Chicago-Read
Mental Health Center, a facility of the Illinois Department of Human Services (IDHS), after
she refused to submit to a psychiatric examination. Bottoms, who is African-American,
charges racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964,
42 U.S.C. §§ 2000e-2000h. The district court granted summary judgment for IDHS and

---

[*] After examining the briefs and the record, we have concluded that oral argument is
unnecessary. The appeal is submitted on the briefs and the record. *See* FED. R. APP. P.
34(a)(2).

Chicago-Read because Bottoms did not present a triable issue of fact on essential elements of her claims. Bottoms appeals, and we affirm.

Bottoms began her employment at Chicago-Read in 1991. She received generally positive evaluations until October 1998, when she was transferred to the general-stores division to work as an office assistant under the supervision of Marilyn Targos, who is white. Bottoms, who had complained about discrimination in her previous department, says that Targos told her that management had placed her in the general-stores division so that Targos could "get rid of [her]." Targos denies saying that.

It is undisputed that Bottoms and Targos had a strained relationship. It is also undisputed that Bottoms was idle for 70% of her work day in the general-stores division. The parties differ, though, on the reasons why. Bottoms maintains that Targos never trained her for the position and would not let her do her work. Targos says that she had to complete Bottoms's duties because Bottoms's work was unsatisfactory. In any event, at the suggestion of the hospital administrator, Dr. James Brunner, Targos told Bottoms that they would meet twice a week to review her assignments and resolve any difficulties. Although Targos had not described the meetings as disciplinary, Bottoms felt singled out and brought a union representative to the first meeting, which occurred in March 1999. The representative left after Targos told her that the meeting was purely informational and not disciplinary, but the meeting did not proceed. Further supervisory meetings were attempted and aborted, although the record is unclear why.

As their relationship soured, Bottoms twice complained about Targos's behavior. First, Bottoms says that on March 19, Targos hit Bottoms with a locker door as she was closing it. Targos does not recall whether the door hit Bottoms, but she says that if it happened it was accidental. Bottoms was not injured, but she thought the action was intentional and filed an internal complaint. As far as the record shows, IDHS did not investigate the incident, and no disciplinary action was taken against Targos. Second, on March 24, according to Bottoms, Targos entered her office, yelled at her, and backed her against the door. Bottoms called the Chicago police but did not ask them to come. She again filed an internal complaint, and again, on this record, no investigation occurred, nor did Targos face any disciplinary action.

On April 30, Jack Amoruso, an auditor working in the office next to Bottoms, sent Brunner an unsolicited memo about Bottoms's behavior. He said that Bottoms was "very uncooperative," was not performing her job duties, was rude, spent work time on her personal laptop rather than answering the telephone, and would wear gloves to avoid "touch[ing] anything that any of the white employees touch." (Bottoms says she wore gloves to protect her hands from cuts and dust.) Amoruso stated that he believed that

Bottoms "should get some counseling, on the proper prospective [sic] with dealing with other employees, proper telephone etiquette and receive a Psychiatric Assessment." He suggested, alternatively, that she be transferred to "another operational area, with someone as her supervisor, who is of the same race as her. Then if the problems surface again, it could be that she really can't work with her peers . . . ." Brunner did not take immediate action against Bottoms after receiving Amoruso's memo.

On May 10, Thomas Mathew and Timothy Murphy, Bottoms's coworkers, entered her office to use the file cabinets, leaving the door to her office open. Bottoms says she asked Mathew three times to close the door, but he did not respond. Angered, Bottoms got up from her desk to reach around Mathew and shut the door. Mathew says that the door hit his arm, painfully pinning his elbow between the door and the door jamb. Mathew reported the incident to Targos and went to a doctor, who recommended that he be placed on restricted duty for three days—he was not permitted to lift, push, or pull anything over 20 pounds and wore a bandage on his arm. In response, Brunner placed Bottoms on paid administrative leave, pending an investigation by James Schiltz, an investigator from IDHS's office of internal review. After interviewing Bottoms, Mathew, and Murphy, Schiltz concluded that Bottoms did not intentionally injure Mathew but showed a "clear disregard for [his] physical well being." Bottoms has not contested Schiltz's conclusion; she simply maintains that she did not injure Mathew.

On the basis of Schiltz's report, as well as the prior complaints from Targos and Amoruso, Brunner directed Bottoms to undergo a psychiatric examination on June 10 to determine her fitness to do her job. Bottoms refused to attend the examination, which she said was an invasion of her privacy. Brunner rescheduled the examination for June 25 and again directed Bottoms to appear. Bottoms again refused to attend because, she says, Brunner had not addressed her privacy concerns. She filed a discrimination charge with the EEOC on June 26.

On June 28 Brunner suspended Bottoms, explaining that her failure to attend the psychiatric examinations were acts of insubordination. On July 13 Bottoms's union representative advised her to comply with Brunner's directives. Brunner then gave Bottoms a final opportunity to appear for a fitness-for-duty examination on September 7. He explained that the results of the examination would be sent to him but would not be shared with Targos or anyone outside of the human resources department. He further explained that he was ordering the examination because Schiltz had found that Bottoms's behavior toward Mathew demonstrated a disregard for his well-being and because Brunner had received other reports that Bottoms had been "openly hostile and confrontational with co-workers and other hospital staff, attempted to involve the Chicago Police Department in

regular supervisory meetings, and [was observed] talking to [her]self." When Bottoms again did not comply, Brunner fired her.

Bottoms timely filed suit in federal court, but the district court granted IDHS's motion for summary judgment after concluding that Bottoms had not established a prima facie case of discrimination or retaliation. The court determined that Bottoms did not identify a similarly situated employee who was treated more favorably, nor did she adduce evidence sufficient to prove that she performed her job to IDHS's legitimate expectations. The district court also ruled that, even assuming that Bottoms had made such a showing, she had not presented a triable issue of fact that the proffered reasons for her termination were pretextual.

Bottoms now argues that she raised a genuine issue of fact on her claims that IDHS terminated her on the basis of race and in retaliation for her complaint of discrimination to the EEOC. Among other arguments, she challenges the district court's determination, on both counts, that she did not identify similarly situated coworkers who were treated more favorably.

Bottoms proceeds only under the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a *prima facie* case of either discrimination or retaliation under the indirect method, Bottoms must produce, among other things, evidence that her employer treated her more harshly than non-African-American or non-complaining coworkers who were alike in all material respects. *See Beamon, v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 861-62 (7th Cir. 2005). In this context, a similarly situated employee is one who was performing at a comparable level, had similar qualifications, and conducted herself similarly to Bottoms. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Although this "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct," the inquiry is flexible and ultimately depends on the context of the case. *Id*. at 617-18; *accord Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, No. 06-1431, 76 U.S.L.W. 4322 (U.S. May 27, 2008).

The district court correctly concluded that Bottoms failed to identify an employee who conducted himself similarly and was treated differently. Bottoms attempts to compare herself to Targos, but she is not similarly situated—not because she was Bottoms's supervisor, *see, e.g.*, *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005), but because Brunner never demanded that Targos attend a fitness-for-duty examination. Bottoms contends that that very fact shows disparate treatment despite somewhat similar behavior, but her subsequent insubordination rendered obsolete the comparison. In refusing three separate directives to attend fitness-for-duty examinations—even after her union urged her to attend

them—Bottoms behaved in a manner materially different from Targos. *See, e.g., Radue*, 219 F.3d at 618-19. Moreover, the two other white employees Bottoms identified—Elizabeth Oppenheim and Lloyd Rosenberg—do not satisfy this aspect of her claim. Oppenheim, unlike Bottoms, initially refused to undergo a fitness-for-duty examination but complied when she was asked a second time; ultimately she kept her job. Rosenberg, too, complied with the request for an examination but was terminated because he was deemed unfit to return to work.

Finally, even if Bottoms could establish a prima facie case of discrimination, she has no evidence from which a jury reasonably could conclude that IDHS's proffered reason for terminating her—her failure to attend the fitness-for-duty examinations—was pretextual (i.e., false). *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006). The only whiff of discrimination in this case—Amoruso's suggestion that Brunner transfer Bottoms to a department with an African-American supervisor—did not come from the decision-maker, and there is no evidence that Brunner relied on Amoruso's comments when he fired Bottoms. *See Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 917-18 (7th Cir. 2007). Moreover, Bottoms has not identified any weakness, implausibility, or inconsistency in the asserted basis for her termination. Indeed, no employee who outright refused to attend a fitness-for-duty examination has ever kept her job at IDHS.

AFFIRMED.