In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 05-4047

HEDRICK G. HUMPHRIES,

*Plaintiff-Appellant,*

*v.*

CBOCS WEST, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-C-3765—**Charles P. Kocoras**, *Judge.*

---

ARGUED MARCH 28, 2006—DECIDED JANUARY 10, 2007

---

Before EASTERBROOK, *Chief Judge*, and POSNER and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Hedrick Humphries filed a
suit alleging claims of discrimination and retaliation
under Title VII and 42 U.S.C. § 1981 against CBOCS West,
Inc., based upon his discharge as an associate manager at
one of defendant's Cracker Barrel restaurants. After
dismissing Humphries's Title VII claims as procedurally
barred, the district court granted summary judgment in
favor of CBOCS West, Inc. (hereinafter "Cracker Barrel"),
holding that Humphries could not establish his prima
facie burden of showing that a similarly situated individ-
ual in a non-protected class was treated more favorably.

We reverse the district court's grant of summary judgment as to Humphries's retaliation claim because Humphries made a sufficient showing under the indirect method to establish a prima facie case of retaliation under section 1981. We affirm the judgment as to Humphries's discrimination claim because Humphries forfeited this claim by failing to present an adequate argument before the district court.

## I. BACKGROUND

The following facts are recounted in the light most favorable to Humphries, the non-movant. Humphries, an African-American male, was an associate manager at a Cracker Barrel restaurant in Bradley, Illinois. Associate managers at Cracker Barrel are supervised by a general manager, who in turn is supervised by a district manager. In this case, three general managers cycled through during Humphries's three-year tenure: Don Sessions, Steve Cardin and Ken Dowd. His performance during his first two-and-a-half years (roughly February 1999 through mid-July 2001) was generally excellent. For instance, he received annual merit raises and bonuses, and his supervisor (Sessions) testified that he considered Humphries to be his best associate manager. Circumstances changed for Humphries when Cardin took over (as a temporary replacement) for Sessions. According to Humphries, Cardin routinely made racially derogatory remarks, such as stating that all African-Americans are "drunk or high on drugs" or that "all Mexicans have a bunch of kids." Humphries alleges that other employees confirmed Cardin's inappropriate comments, and told Humphries that Cardin had stated that he was there "for the white people" and was "going to take care of the white people."

Within Cardin's initial month of being the general manager, he issued Humphries five disciplinary reports,

called Employee Counseling Reports (ECRs). The ECRs covered a wide range of alleged misconduct, including bank deposit shortages and inappropriate use of Gold Cards to provide complaining customers a free meal. Humphries claims that the ECRs were groundless and reflected Cardin's racial animus. In response, in August or September 2001, Humphries complained to Cardin's supervisor, district manager William Christensen. Christensen, however, appears not to have conducted any investigation of Humphries's claims, contrary to Cracker Barrel policies.

In September 2001, Ken Dowd became general manager (Cardin returned, as planned, to his store). Shortly thereafter, Joe Stinnett, one of Humphries's fellow associate managers, fired an African-American food server, Venis Green, because she purportedly failed to show up for a shift. Humphries complained to both Dowd and Christensen that Stinnett's firing of Green was discriminatory because, among other things, Green had informed both Humphries and another associate manager that she could not work that shift. Moreover, according to Humphries, a white employee had failed to appear at work on several occasions without notice, but was not fired. Humphries also reminded Christensen of his earlier complaints regarding former-general manager Cardin. According to Humphries, Christensen berated him for "going outside the management group" (i.e., turning to Christensen, rather than Dowd, to complain) and demanded that Humphries schedule a meeting with Dowd for the following week.

This scheduled meeting never occurred because on December 5, 2001 (the day before Humphries's scheduled meeting with Dowd), Christensen fired Humphries, based upon Stinnett's complaint that Humphries had left the store safe unlocked during the evening—a charge that Humphries disputes. Humphries also claims that prior to

his firing (and before his alleged failure to lock the safe), a cashier warned him that he should watch himself because Christensen and Stinnett were "up to something." After being informed by Stinnett that Humphries had left the safe unlocked, Christensen immediately terminated Humphries—without interviewing him or investigating the incident to determine whether Humphries had actually left the safe open.

Humphries subsequently brought claims of discrimination and retaliation under Title VII and section 1981. The district court dismissed Humphries's Title VII claims due to procedural deficiencies (and Humphries does not appeal this determination). The district court also granted summary judgment in favor of Cracker Barrel on Humphries's section 1981 claims, finding that Humphries failed to establish his prima facie case under either the direct or indirect method. Humphries now appeals.

## II. ANALYSIS

A. Historical Overview of Retaliation Claims under Section 1981

Before we turn to the merits of this appeal, we must decide whether Humphries's retaliation claim is cognizable under section 1981. Although Cracker Barrel failed to raise this issue in the district court, it now claims that our decision in *Hart v. Transit Management of Racine, Inc.*, 426 F.3d 863 (7th Cir. 2005), precludes Humphries's retaliation claim. In the normal course, when a party fails to present an argument in the trial court, it forfeits the argument on appeal. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 728 (7th Cir. 2004); *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 107-10 (7th Cir. 1990). At oral argument, counsel for Cracker Barrel explained that he did not raise this issue in the district

court because *Hart*, which he contended created a change in the law in this circuit, had not yet been issued. Although (as we will explain later), we do not believe that *Hart* changed our jurisprudence regarding section 1981 retaliation claims, we will not penalize Cracker Barrel for failing to raise its argument below.[1]

Of course, we retain the right to consider forfeited arguments, and may choose to do so "in the interests of justice." *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1122 (7th Cir. 1998); *see also Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749-50 (7th Cir. 1993) (holding that "[i]n the rare case in which failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note, we have the power and the right to permit it to be raised for the first time to us"). In this instance, given that our recent *Hart* decision

---

[1] We note that there is some confusion in this circuit as to whether an appellee—as opposed to an appellant—who failed to raise to a particular argument in the district court in support of his motion for summary judgment is precluded from raising new arguments in this court to affirm the district court's ruling. *Compare, e.g.*, *Gray v. Lacke*, 885 F.2d 399, 409 (7th Cir. 1989) (holding that appellees waived a claim by failing to raise it in the district court)*, and Baskin v. Clark*, 956 F.2d 142, 146 (7th Cir. 1992) (same), *with Transamerica Ins. Co. v. South*, 125 F.3d 392, 399 (7th Cir. 1997) ("We certainly agree that the failure of an appellee to have raised all possible alternative grounds for affirming the district court's original decision, unlike an appellant's failure to raise all possible grounds for reversal, should not operate as a waiver. The urging of alternative grounds for affirmance is a privilege rather than a duty." (quoting *Schering Corp. v. Ill. Antibiotics Co.*, 89 F.3d 357, 358 (7th Cir. 1996))). We need not resolve this question because we choose to review this issue, irrespective of whether Cracker Barrel forfeited the issue or not.

appears to have created some confusion in the district courts and has already been misapplied in several decisions, it is in the interests of justice to clarify the issue of whether retaliation claims are cognizable under section 1981 (and, in so doing, clarify our ruling in *Hart*). *See Amcast*, 2 F.3d at 749-50 (reaching issue not raised below because it was fully briefed on appeal, rested "entirely on a pure issue of statutory interpretation, as to which the district judge's view, while it would no doubt be interesting, could have no effect on our review, which is plenary on matters of law[, and] there is no reason to defer its resolution to another case. There will be no better time to resolve the issue than now."); *Mass. Bay Ins. Co.*, 136 F.3d at 1122 (reaching forfeited choice-of-law issue because "we clearly think it is in the interest of justice to insure that district courts conduct choice-of-law analyses when conflicts questions are presented to them").

### 1.   Section 1981's Origin in the Civil Rights Act of 1866

The language codified in section 1981 derives from section 1 of the Civil Rights Act of 1866, a Reconstruction-era statute that is generally recognized as the first significant civil rights legislation enacted by Congress, and is considered the "initial blueprint of the Fourteenth Amendment." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982); *see generally Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422-37 (1968) (discussing legislative history and historical context of the Civil Rights Act of 1866); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 711-22 (1989) (same); *Patterson v. McLean Credit Union*, 491 U.S. 164, 192-200 (1989) (Brennan, J., concurring in part and dissenting in part) (same); Robert J. Kaczorowski, Comment, *The Enforcement Provisions of the Civil Rights Act of 1866: A Legislative History in Light of* Runyon v. McCrary, 98 Yale L.J. 565 (1989). The

legislative history of the Civil Rights Act of 1866 is complicated—and not without substantial interpretive disagreement. *See generally* George Rutherglen, *The Improbable History of Section 1981: Clio Still Bemused and Confused*, 2003 Sup. Ct. Rev. 303. The Civil Rights Act of 1866 was passed pursuant to section 2 of the Thirteenth Amendment, which provided Congress with the legislative power to enforce the Thirteenth Amendment's prohibition on slavery. U.S. Const. amend. XIII, § 2. The Act was a direct response to the so-called "Black Codes," a series of legislative acts by many southern (and some northern) states in protest of, and as a tacit attack upon, the recently enacted Thirteenth Amendment. The Black Codes imposed onerous legal limitations on newly-freed former slaves in an attempt to circumvent the requirements of the Thirteenth Amendment, and essentially continued a pattern of legal enslavement. *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 70 (1873) (noting that following the passage of the Thirteenth Amendment, "[a]mong the first acts of legislation adopted by several of the States in the legislative bodies which claimed to be in their normal relations with the Federal government, were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty, and property to such an extent that their freedom was of little value"); *see generally* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 Harv. J. on Legis. 187, 240-46 (2005) (discussing the Black Codes).

In response to the states' attempts to circumvent the requirements of the Thirteenth Amendment, section 1 of the Civil Rights Act of 1866 conferred a series of legal rights, including the right to contract, and to hold and

convey property, equally to citizens.[2] Portions of section 1 are now codified in section 1981, which states, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42. U.S.C. § 1981(a). Other portions of section 1 are now codified in section 1982, which states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by

---

[2] In 1870, after ratification of the Fourteenth and Fifteenth Amendments, Congress re-enacted the Civil Rights Act of 1866 (via the Enforcement Act of 1870), and then codified it in sections 1977 and 1978 of the Revised Statutes of 1874. The 1870 re-enactment, which followed passage of the Fourteenth Amendment, has caused significant debate regarding whether sections 1981 and 1982 apply to private actors or, instead, are limited to state actors, pursuant to the Fourteenth Amendment. *Compare, e.g.*, *Jones*, 392 U.S. at 436 (concluding that "it certainly does not follow that the adoption of the Fourteenth Amendment or the subsequent readoption of the Civil Rights Act were meant somehow to limit its application to state action"), *and Runyon v. McCrary*, 427 U.S. 160, 168-69 n.8 (1976) (same), *with Jones*, 392 U.S. at 449-76 (Harlan, J., dissenting) (evaluating the legislative history and concluding that the Act was intended to reach only state actors), *and Runyon*, 427 U.S. at 195-205 (White, J., dissenting) (same). In any event, it is now well-settled that section 1981 applies to private actors. *See Patterson*, 491 U.S. at 171-76 (refusing to overturn *Runyon*'s determination that section 1981 applied to private conduct).

white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982.

2. *Sullivan v. Little Hunting Park, Inc.* Leads Courts To Conclude that Section 1981 Protects Against Retaliation

The Supreme Court has interpreted section 1981 as providing a broad-based prohibition (and federal remedy) against racial discrimination in the making and enforcing of contracts. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160 (1976); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-62 (1975). The issue of what types of adverse actions are subsumed under the "make and enforce contracts" provision in section 1981 is not without complication, particularly with respect to so-called "postformation conduct" (i.e., adverse acts, such as harassment or retaliation, that occur after an initial contractual relationship has been established). Before its decision in *Patterson*, 491 U.S. 164 (which we shall address below), the Supreme Court had not clearly determined whether section 1981 applied to retaliatory conduct. The closest it came to deciding this issue was in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969). In *Sullivan*, a Virginia nonprofit corporation, created to operate a community park and playground facilities for the benefit of residents, refused a proposed assignment of a membership interest to an African-American man. *Id.* at 234-35. The white homeowner who intended to assign his membership interest protested the corporate board's refusal, and the board expelled him from the corporation. *Id.* at 235. He, along with the would-be assignee, brought suit under sections 1981 and 1982. *Id.* The Court initially noted the "broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, 14 Stat. 27, from

which § 1982 was derived." *Id.* at 237. Relying on the broad protective nature of the Civil Rights Act of 1866, the Court held that the white homeowner had standing to bring a claim under section 1982 (the companion statute to section 1981 pertaining to property rights):

> We turn to Sullivan's expulsion for the advocacy of Freeman's cause. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. That is why we said in *Barrows v. Jackson*, 346 U.S. 249, 259, 73 S. Ct. 1031, 1036, 97 L. Ed. 1586, that the white owner is at times "the only effective adversary" of the unlawful restrictive covenant. Under the terms of our decision in *Barrows*, there can be no question but that Sullivan has standing to maintain this action.

*Id.* at 237. Although the *Sullivan* court did not explicitly use the term "retaliation" in its decision, it was clear that the white landowner's basis for standing was that he had suffered retaliation for asserting the rights of another (i.e., he had been "punished for trying to vindicate the rights of minorities"). *Id.* (And, indeed, as will be discussed further below, the Supreme Court later interpreted *Sullivan* precisely in this manner in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005).)

Following *Sullivan*, and prior to *Patterson*, the general consensus among the circuits was that section 1981 broadly prohibited discrimination in all contractual facets of the employment relationship, including "postformation" adverse acts, such as retaliation. *See, e.g.*, *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 42-43 (2d Cir. 1984) (retaliation cognizable under section 1981); *Goff v. Cont'l Oil Co.*, 678 F.2d 593, 597-99 (5th Cir. 1982) (same);

*Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1268-70 (6th Cir. 1977) (same); *Setser v. Novack Inv. Co.*, 638 F.2d 1137, 1147 (8th Cir. 1981) (same); *London v. Coopers & Lybrand*, 644 F.2d 811, 819 (9th Cir. 1981) (same). This court, however, did not definitively decide this issue in the pre-*Patterson* era. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1313 (7th Cir. 1989) (noting that although "[t]here is a substantial body of court of appeals precedent" holding that section 1981 forbids retaliation, there was "nothing in this circuit").

3.  *Patterson v. McLean Credit Union* Narrows the Reach of Section 1981

In 1989, the Supreme Court issued its decision in *Patterson*, which severely curtailed the reach of section 1981 claims. The *Patterson* court held that section 1981 protections applied exclusively to two types of rights: the right to make contracts and the right to enforce them. 491 U.S. at 176. The first right is violated by a "refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Id.* at 177. Importantly, however, that right "extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment." *Id.* at 176. The second right, the right to enforce contracts, "does not . . . extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Id.* at 177-78. Thus, section 1981's prohibition did not include so-called "postformation" discriminatory conduct of an employer, including the breach of the terms of the contract or imposition of discriminatory working conditions, such as racial harassment. *Id.* at 178-82. *Patterson*, however, was silent as to the issue of retaliation.

Even though *Patterson* involved only racial harassment and the term "retaliation" appears nowhere in the opinion,

several circuits—including this one—interpreted *Patterson* as precluding retaliation claims under section 1981 because such employer behaviors purportedly involved now-unprotected postformation conduct. *See, e.g.*, *Gonzalez v. Home Ins. Co.*, 909 F.2d 716 (2d Cir. 1990); *Carter v. South Cent. Bell*, 912 F.2d 832, 838-41 (5th Cir. 1990); *McKnight v. Gen. Motors Corp.*, 908 F.2d 104, 107-10 (7th Cir. 1990); *Courtney v. Canyon Television & Appliance Rental, Inc.*, 899 F.2d 845, 849 (9th Cir. 1990); *Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1535 & n.17 (11th Cir. 1990); *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565 (D.C. Cir. 1991); *see also Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003) (noting that *Patterson* "marked a dramatic change in § 1981 juris-prudence"); *but see Hicks v. Brown*, 902 F.2d 630, 635-38 (8th Cir. 1990) (holding that *Patterson* did not address retaliation claims and should not be read as foreclosing such claims under section 1981). In the immediate after-math of *Patterson*, we decided *Malhotra v. Cotter & Co.*, 885 F.2d 1305 (7th Cir. 1989), in which we observed that "*Patterson* might be thought to foreclose any suggestion that retaliation could be actionable under" section 1981. *Malhotra*, 885 F.2d at 1312. Specifically, we noted that "retaliation and discrimination are separate wrongs. A white person who opposes discrimination against blacks and is fired in retaliation for doing so is not being discrimi-nated against because of his race . . . ." *Id.* (citations omitted). At the same time, we also observed that "it can be argued that someone who retaliates against a person who has a claim of employment discrimination that might be actionable under section 1981 . . . is interfering with the person's *ability* to make or enforce contracts on the same footing with white persons and such interference could be thought itself a violation of section 1981." *Id.* at 1313 (citations omitted) (emphasis in original). Of particu-lar note here, we did not decide whether *Patterson* defini-

tively precluded retaliation claims, and even hinted that such claims "may well survive *Patterson*." *Id.*

In a concurring opinion in *Malhotra*, Judge Cudahy concluded that *Patterson* did not preclude retaliation claims.[3] Specifically, Judge Cudahy observed that there was "little parallel between harassment and retaliation. Hence, the refusal of *Patterson* to countenance harassment claims under section 1981 has only the most superficial application to claims for retaliation."[4] *Id.* at 1314 (Cudahy, J., concurring); *see also Hicks*, 902 F.2d at 635-38 (holding that *Patterson* applied solely to the unique context of racial harassment and did not preclude retaliation claims). And, in prescient comments that anticipated the Supreme Court's result in *Jackson*, 544 U.S. 167, Judge Cudahy stated:

> A prohibition against retaliation is a necessary adjunct to the anti-discriminatory provision itself. If an employee may be fired for complaining of discrimination,

---

[3] *See also Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1053 (7th Cir. 1991) (suggesting that *Patterson* may not have foreclosed all retaliation claims).

[4] Judge Cudahy also noted that "to the limited extent *Patterson* is relevant here, it would appear to *support* the recognition of a cause of action for retaliatory conduct" because the *Patterson* court recognized that section 1981's right to "enforce contracts" prohibits efforts to "impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Malhotra*, 885 F.2d at 1314 n.1 (citations omitted). "Clearly, when an employer punishes an employee for attempting to enforce her rights under section 1981, this conduct 'impairs the employee's ability to enforce her contract rights.'" *Id.* This is an intriguing argument, but one that we need not re-visit in light of our conclusion that retaliation claims are now covered under section 1981's "make and enforce contracts" provision.

his right not to be discriminated against is surely
vitiated. . . . The recognition of a right of action for
retaliation under section 1981 is simply another
application of a straightforward syllogism: if an
employee is granted certain substantive rights against
his or her employer, the employer may not punish
the employee's assertion of those rights, since this
would allow the employer to take away a right to
protection conferred by statute.

*Id.* at 1314-15.

Judge Cudahy's view in *Malhotra* did not carry the day
in this circuit during the brief post-*Patterson* era. Shortly
thereafter, we issued our *McKnight* decision, where we,
like most other circuits, interpreted *Patterson* as foreclos-
ing section 1981 coverage of retaliation claims. *See
McKnight*, 908 F.2d at 107-08; *see also Von Zuckerstein v.
Argonne Nat'l Lab.*, 984 F.2d 1467, 1471-72 (7th Cir. 1993);
*McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 688 (7th
Cir. 1991). *But see Hicks*, 902 F.2d at 635-38 (holding
that *Patterson* did not foreclose retaliation claims). In
*McKnight*, the plaintiff brought suit under section 1981
and Title VII, claiming that his employer had discrimi-
nated against him based on his race and had fired him in
retaliation for complaining about the discrimination.
*McKnight*, 908 F.2d at 107-08. Although we noted that
"*Patterson* was a racial-harassment case rather than a
discharge case," we nonetheless held that *Patterson*'s
"wide-ranging reexamination of section 1981 indicated
(as it seems to us) that claims of racially motivated dis-
charge are not actionable under that statute." *Id.* at 108.

Judge Fairchild, however, concurred and dissented in
part from the majority's opinion, because, in his view,
*Patterson* "did not expressly assert that a racially dis-
criminatory termination would not be a violation of
§ 1981." *Id.* at 117. Instead, he reasoned that the analysis

in *Patterson* was limited to the narrow issue of whether a change in the conditions of employment following the formation of the employment contract (specifically, racial harassment)—but not a termination—violated section 1981. *Id.* As a result, Judge Fairchild concluded that the right to make contracts established in section 1981 protected "the right to continue to work, in the face of racially discriminatory termination"—a result unaltered by *Patterson. Id. But see Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312 (1994) (noting that "*Patterson* did not overrule any prior decision of this Court; rather, it held and therefore established that the prior decisions of the Courts of Appeals which read § 1981 to cover discriminatory contract termination were *incorrect.*" (emphasis in original)).

4.   The Civil Rights Act of 1991 Supercedes *Patterson*

Whether the majority opinion in *McKnight* or Judge Cudahy's or Judge Fairchild's reading of *Patterson* was correct is now irrelevant because *Patterson*'s influence was short-lived. Unhappy with the result issued in *Patterson*, Congress legislatively superceded the *Patterson* decision by enacting the Civil Rights Act of 1991. *See Rivers*, 511 U.S. at 305-06, 305 n.5 (noting that the Civil Rights Act of 1991 was based on Congressional and Presidential disapproval of the *Patterson* decision); *Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003) (noting that "Congress, however, quickly responded [to *Patterson*] with the Civil Rights Act of 1991, which, *inter alia*, overruled *Patterson*"). The legislative history of the Civil Rights Act of 1991 makes clear that Congress was dissatisfied with the Supreme Court's narrow reading of section 1981, which strongly curtailed claims that had been cognizable in the pre-*Patterson* period. *See Rivers*, 511 U.S. at 306 n.6 (citing S. Rep. No. 101-315, pp. 12-14

(1990)). Among other things, Congress added subsection (b)
to section 1981, which made clear that section 1981 was to
be read broadly to include all aspects of the contractual
relationship between parties, including the postforma-
tion conduct, which *Patterson* had concluded was not
actionable under section 1981:

> For purposes of this section, the term "make and
> enforce contracts" includes the making, performance,
> modification, and termination of contracts, and the
> enjoyment of all benefits, privileges, terms, and
> conditions of the contractual relationship.

42 U.S.C. § 1981(b). And the legislative history pertain-
ing to this subsection confirms that Congress intended
retaliation to be included under this provision. *See An-
drews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 n.12
(11th Cir. 1998) (citing H.R. Rep. No. 40(I), 102d Cong., 1st
Sess. 92 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 549,
630, which states, in part, "[t]he list set forth in subsec-
tion (b) is intended to be illustrative rather than exhaus-
tive. In the context of employment discrimination, for
example, this would include, but not be limited to, claims
of harassment, discharge, demotion, promotion, transfer,
*retaliation*, and hiring." (emphasis added)).

The Civil Rights Act of 1991 led several circuits to
reverse course (again) and to allow retaliation claims
under section 1981. *See Foley v. Univ. of Houston Sys.*, 355
F.3d 333, 339 (5th Cir. 2003); *Hawkins v. 1115 Legal Serv.
Care*, 163 F.3d 684, 693 (2d Cir. 1998); *Andrews*, 140 F.3d
at 1412-13; *see also Barge v. Anheuser-Busch, Inc.*, 87 F.3d
256, 259 (8th Cir. 1996) (listing the elements for a *prima
facie* case of retaliation under section 1981). For instance,
in *Andrews*, the Eleventh Circuit noted that prior to
*Patterson*, circuits interpreting section 1981's "make and
enforce contracts" provisions had held that it "encom-
passed an employee's claims for an employer's race-based

retaliation during the employment contract." 140 F.3d at 1410. It observed that while *Patterson* "drew into question many circuit court decisions recognizing post-hiring discrimination claims under section 1981," the Civil Rights Act of 1991 reversed whatever limits *Patterson* placed on imposing liability for postformation conduct. *Id.* at 1410-12. As a result, the Eleventh Circuit concluded that retaliation claims remained viable under section 1981. *Id.* at 1412.

## B. Humphries's Retaliation Claim Is Cognizable Under Section 1981

### 1. We Hold that Section 1981 Protects Against Retaliation

This is the first opportunity we have had since the enactment of the Civil Rights Act of 1991 to re-visit the issue of whether section 1981 forbids all retaliatory discharge claims.[5] Cracker Barrel contends that our decision in *Hart* has already foreclosed retaliation claims under section 1981. *See Hart*, 426 F.3d at 866. This is incorrect. Unfortunately, *Hart* has already been cited for this inaccurate proposition. *See Williamson v. Denk & Roche Builders, Inc.*, No. 04 C 4051, 2006 WL 1987808, at *4 (N.D. Ill. July 11, 2006) (citing *Hart* for the proposition that "the Seventh Circuit has made clear that a retaliation claim is not viable under Section 1981");

---

[5] In *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 n.2 (7th Cir. 1993) we noted that the Civil Rights Act of 1991 had "overruled" *Patterson*, but nonetheless applied the holding of *Patterson* because the Civil Rights Act of 1991 did not have retroactive reach. We also noted, however, that, as a result, "this case represents one of the few in which we still apply the *Patterson* standards." *Id.*

*Franklin v. U.S. Steel Corp.*, No. 2:04 CV 246, 2006 WL 905914, at \*2 (N.D. Ind. Apr. 7, 2006) (same); *Welzel v. Bernstein*, 436 F. Supp. 2d 110, 117 (D.D.C. 2006) (citing *Hart* for the proposition that this circuit, unlike other circuits, precludes retaliation claims under section 1981). Our analysis in *Hart* was limited to the narrow issue of whether an individual who was *not* the subject of discrimination could assert claims of retaliation for complaining about the discrimination of others.[6] We held that section 1981 did not protect against retaliation in such circumstances. *Hart*, 426 F.3d at 866. But *Hart* has no application to the facts here, where the plaintiff is plainly asserting retaliation stemming from discriminatory acts targeting him. (And, as we shall see below, even *Hart*'s limited holding is no longer good law in light of the Supreme Court's *Jackson* decision.)

Thus, the issue before us is whether section 1981, as amended by the Civil Rights Act of 1991, applies to claims of retaliation. We hold that it does. The plain text of the statute, as amended in 1991, makes clear that section 1981 encompasses the "termination of contracts," and there can be no doubt that a retaliatory discharge is indeed a termination of the employment contract.[7] Indeed, the Supreme Court subsequently interpreted the amended provisions of section 1981 as protecting against "discriminatory contract terminations." *Rivers*, 511 U.S. at 302

---

[6] Our decision in *Hart* was initially issued as an unpublished order, but, upon motion to publish it filed by a member of the bar, the order was converted to a published opinion.

[7] The at-will nature (i.e., no formal written contract and no specific terms of employment) of the plaintiff's employment here does not preclude the plaintiff from relying on section 1981's provisions pertaining to contracts. *See Walker*, 340 F.3d at 475-77 (holding that at-will employees can state claims under section 1981).

(stating that "Section 101 of that Act provides that § 1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, including discriminatory contract terminations"). Now, it may be that, strictly speaking, a discriminatory "termination of contract" is not the same thing as a retaliatory discharge—for instance, analytically, retaliation need not have a discriminatory intent behind it. *See Malhotra*, 885 F.2d at 1312; *Jackson*, 544 U.S. at 185-87 (Thomas, J., dissenting). But the Civil Rights Act of 1991 dispensed with this heightened degree of formalism, and the legislative history confirms that Congress intended retaliation to be included within section 1981. *See Andrews*, 140 F.3d at 1411 n.12. As a result, whatever concerns *Patterson* raised about the postformation nature of retaliatory discharges evaporated with the passage of the Civil Rights Act of 1991. *See id.*; *Rivers*, 511 U.S. at 306 n.6. *But see Rivers*, 511 U.S. at 309 n.8 (noting that the "legislative history of the 1991 Act reveals conflicting views about whether § 101 would 'restore' or instead 'enlarge' the original scope of § 1981") and *id.* at 305 ("A legislative response does not necessarily indicate that Congress viewed the judicial decision as 'wrongly decided' as an interpretive matter. Congress may view the judicial decision as an entirely correct reading of prior law—or it may be altogether indifferent to the decision's technical merits—but may nevertheless decide that the old law should be amended, but only for the future.").

  2.   Our Holding Is Consistent with *Jackson v. Birmingham Board of Education*, which Affirmed *Sullivan*'s Continuing Validity

Even if the statute were unclear on this issue—after all, the specific word "retaliation" still does not appear in

section 1981[8]—and without turning to the pertinent legislative history, the Supreme Court's recent decision in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005) compels the same result. In *Jackson*, the male coach of a girls' high school basketball team sued the Birmingham Board of Education under Title IX of the Education Amendments of 1972, claiming that the Board retaliated against him for complaining about sex discrimination in the high school's athletic program. *Id.* at 171. Title IX prohibits sex discrimination by recipients of federal education funding, but, like section 1981, it contains no express mention of "retaliation." *Id.* at 173. Instead, Title IX simply prohibits "discrimination." The Supreme Court, however, determined that Title IX's proscription on discrimination necessarily subsumed (and implied) acts of retaliation, which it viewed as simply different forms of discrimination:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this

---

[8] *Cf.* 42 U.S.C. § 2000e-3(a) (Title VII) (providing that it is an "unlawful employment practice" for an employer to retaliate against an employee because he has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.").

constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

*Id.* at 173-74 (citations omitted) (emphasis in original).

The *Jackson* court relied heavily on its prior decision in *Sullivan*, 396 U.S. 229, where it held that section 1981's companion statute, section 1982, which prohibits discrimination with respect to property rights, contained an implied prohibition against retaliation. *Jackson*, 544 U.S. at 176. Specifically, the *Jackson* court interpreted *Sullivan* as holding that section 1982's general prohibition on racial discrimination, which, like section 1981, makes no mention of retaliation, nonetheless covered "retaliation against those who advocate the rights of groups protected by that prohibition." *Id.* The *Jackson* court also observed that the statutory objective of preventing discrimination would be severely hampered if retaliatory practices were not also banned: "If recipients were permitted to retaliate freely, individuals who witness discrimination would be loathe to report it, and all manner of Title IX violations might go unremedied as a result." *Id.* at 180 (citing *Sullivan*, 396 U.S. at 237). "Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.*

Thus, the *Jackson* court appears to have jettisoned our prior observation that "retaliation and discrimination are separate wrongs." *Cf. Malhotra*, 885 F.2d at 1312; *see Jackson*, 544 U.S. at 185-87 (Thomas, J., dissenting) (noting that "[a] claim of retaliation is not a claim of discrimination on the basis of sex" and that "[r]etaliation therefore cannot be said to be discrimination on the basis of anyone's sex, because a retaliation claim may succeed where no sex discrimination ever took place"). Instead, at least for the purpose of interpreting broad statutory discrimination prohibitions that omit specific retaliation provisions, the Supreme Court has determined

that retaliation is simply a different form of discrimination, and one that is included within broad-based prohibitions of discrimination. *See Jackson*, 544 U.S. at 175 (distinguishing between the structure of Title VII, which includes express retaliation provisions, and Title IX's "implied" cause of action). Moreover, the *Jackson* court noted that a statute targeting discrimination would necessarily be undercut if retaliatory acts evaded its purview. *Id.* at 180. And although *Jackson* directly targeted Title IX, there is no meaningful analytic distinction that renders the conclusion in *Jackson* inapplicable to section 1981.[9] That is, like Title IX, section 1981 broadly prohibits discrimination (although only Title IX, enacted roughly a century after section 1981, contains the more contemporary term of "discrimination"), fails to list specific discriminatory practices, and omits specific references to retaliation. *See id.* at 175-76.

---

[9] Our colleague in dissent argues that the analysis in *Jackson* was particularized to Title IX and thus not applicable to our discussion of section 1981. We disagree. In *Jackson*, the Supreme Court relied in large part upon *Sullivan*, a case concerning section 1982. *See, e.g.*, *Jackson*, 544 U.S. at 176 ("Congress enacted Title IX just three years after *Sullivan* was decided, and accordingly that decision provides valuable context for understanding the statute."); *id.* at 177 ("Retaliation for Jackson's advocacy of the rights of the girls' basketball team in this case is discrimination on the basis of sex, just as retaliation for advocacy on behalf of a black lessee in *Sullivan* was discrimination on the basis of race."). Therefore, *Jackson*'s reasoning did not depend upon features unique to Title IX, and *Jackson* has implications for cases involving section 1982 and its companion statute—section 1981. Moreover, the *Jackson* Court's reliance upon *Sullivan* affirms *Sullivan*'s continuing validity. Irrespective of our impression of *Sullivan*'s interpretive method, then, we are bound by its holding. That holding, in part, leads us to conclude (as has every circuit to address the question) that a retaliation claim is cognizable under section 1981.

Indeed, the fact that Title IX omitted any mention of retaliation, even though it was enacted in 1972, eight years after Title VII and its specific inclusion of retaliation provisions, did not trouble the *Jackson* court nor lead it to conclude that Congress must have intended to exclude retaliation from Title IX's coverage. *See id.* To the contrary, the Court looked to its *Sullivan* decision (which was issued three years before the passage of Title IX) and concluded that it provided "a valuable context for understanding" Title IX. *Id.* at 176. Specifically, the Court stated "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [*Sullivan*] and that it expected its enactment [of Title IX] to be interpreted in conformity with [it]." *Id.* (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 699 (1979)).

Thus, the foundation of the *Jackson* decision is built squarely upon the Court's prior determination in *Sullivan* that section 1 of the Civil Rights Act of 1866 was intended as a broad prohibition on discrimination that contained an implied cause of action for retaliation. *Id.*; *see Sullivan*, 396 U.S. at 237 ("A narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866, 14 Stat. 27, from which § 1982 was derived."). And there can be no doubt that *Sullivan*'s examination of section 1982 with respect to implied prohibitions on retaliation readily applies to its companion statute, section 1981, given that sections 1981 and 1982 are simply carve-outs of the same section of the Civil Rights Act of 1866, sharing identical historical origins and concerns. *See, e.g., Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384 (1982) (noting the shared legislative history between section 1981 and its "companion" section 1982); *Runyon*, 427 U.S. at 170-71 (noting that the holding in *Jones*, 392 U.S. at 437 pertaining to section 1982 necessarily impli-

cated section 1981, given their shared legislative history); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440 (1973) (holding that "[i]n light of the historical interrelationship" between sections 1981 and 1982, there was no reason to construe the sections differently solely on the basis that the defendant was a private party); *see also Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977) (holding that "in view of both Sections 1981 and 1982 being derived from the Civil Rights Act of 1866 and in view of the similarity in language and intent, no reason is seen not to apply the rationale of *Sullivan* in interpreting Section 1981"); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 n.9 (2d Cir. 1975) (same).

3. Our Holding Is Sensible and Aligned with the Weight of Authority

Accordingly, we join the other circuits that have addressed this issue in the post-Civil Rights Act of 1991 era—all of whom uniformly conclude that retaliation claims are cognizable under section 1981. *See Foley*, 355 F.3d at 339; *Hawkins*, 163 F.3d at 693; *Andrews*, 140 F.3d at 1410-11; *Barge*, 87 F.3d at 259. Not only is this result compelled by the Civil Rights Act of 1991 and corresponding Supreme Court authority, but it is also the sensible result. To hold that section 1981 allows unfettered retaliation is to invite wholesale circumvention (and eventual undermining) of the statute, and it would create perverse incentives for the employer to fire complainants as quickly as possible to thereby limit (or entirely avoid) damages under section 1981. *See, e.g.*, *Goff*, 678 F.2d at 598 (noting that "Section 1981 would become meaningless if an employer could fire an employee for attempting to enforce his rights under that statute"). This is not an insignificant issue, as section 1981 damages often have more teeth than those available under Title VII.

There is no traction in observing that Title VII provides a back-up or competing statutory regime to the plaintiff. *See generally Randolph v. IMBS, Inc.*, 368 F.3d 726, 732 (7th Cir. 2004) (noting the significant overlap and differences in the two statutory schemes). Although the substantive overlap and procedural inconsistencies between section 1981 and Title VII animated the Court's concerns in *Patterson*, Congress is not bothered by this parallel statutory scheme. *See Johnson*, 421 U.S. at 459 ("'[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.' In particular, Congress noted 'that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive.'" (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. at 48 and H.R. Rep. No. 92-238, at 19 (1971)); *see also Patterson*, 491 U.S. at 201-12 (Brennan, J., concurring and dissenting in part) (citing and discussing legislative history indicating that Congress intended to maintain section 1981 and Title VII as "separate, distinct, and independent"); *Randolph*, 368 F.3d at 732. Nor is it our role to attempt to harmonize these statutes or seek to channel particular causes of action toward one or the other statute. Congress has unmistakably provided for two separate regimes to redress, in many instances, identical discriminatory practices in the employment context. The resolution of any inefficiencies resulting from the existence of two parallel (but quite different) statutory regimes that cover similar harms, but contain differing procedural requirements, limitations periods, and remedies, resides with Congress, not us.

4.  We Overturn *Hart* to the Extent that it Conflicts
    with *Sullivan* and *Jackson*

We must now briefly return to *Hart*, where we held that
a white employee who alleged that he suffered retalia-
tion for supporting his co-worker's charge of discrimina-
tion could not maintain such a claim because section 1981
"encompasses only racial discrimination on account of the
plaintiff's race and does not include a prohibition against
retaliation for opposing racial discrimination." *Hart*, 426
F.3d at 866. In so holding, we relied solely on the Eleventh
Circuit's decision in *Little v. United Technologies, Carrier
Transicold Division*, 103 F.3d 956 (11th Cir. 1997), which
held that a white employee who opposed a co-worker's
racially derogatory remark could not bring a section 1981
retaliation claim because he did not contend that the
employer "discriminated against him because he was
white" (i.e., did not claim direct discrimination). *Id.* at 961.
The *Little* decision, however, cited no authority for this
proposition, nor did it provide reasoning for this declara-
tion.[10] *Id.* We likely placed too much reliance on *Little*,
given that its holding runs squarely against the Supreme
Court's *Sullivan* decision, as well as the Court's subse-
quent decision in *Jackson*, which further solidified
*Sullivan*'s holding. *See Sullivan*, 396 U.S. at 237; *Jackson*,
544 U.S. at 173-74; *see also Warth v. Seldin*, 422 U.S. 490,
514 n.22 (1975) (citing *Sullivan* for the proposition that
sections 1981 and 1982 are examples of "exceptions" that
allow parties "to raise putative rights of third parties,"

---

[10] In addition, the Eleventh Circuit subsequently hinted that
*Little* may conflict with its decision in *Jackson v. Motel 6
Multipurpose, Inc.*, 130 F.3d 999 (11th Cir. 1997), which held that
a class of employees could proceed on a section 1981 retaliation
claim based on allegations that they were fired for refusing to
participate in an employer's discrimination against non-white
customers. *See Andrews*, 140 F.3d at 1412 n.14.

including such situations where a party is "punished" for entering into a contractual relationship with an individual protected under the statute). *Jackson*, which was issued after *Little*, but while the *Hart* appeal was pending, made clear that *Sullivan* prohibits "retaliation against those who advocate the rights of groups protected" by section 1 of the Civil Rights Act of 1866. *Jackson*, 544 U.S. at 176. Thus, *Sullivan* stands for the proposition that a "white owner could maintain his *own* private cause of action under § 1982 if he could show that he was 'punished for trying to vindicate the rights of minorities.'" *Id.* at 176 n.1. Aside from conflicting with *Sullivan* and *Jackson*, the *Little* decision is plainly the minority view among the circuits: the great weight of authority is that individuals who suffer retaliation for opposing the racial discrimination suffered by others have standing to assert retaliation claims under section 1981.[11]

---

[11] *See, e.g.*, *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 14 (1st Cir. 1979) (holding that corporation had standing to bring section 1981 claim and that "to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination"); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 312 (2d Cir. 1975) (white plaintiff could bring section 1981 claim based upon allegation that his employer "'forced' him into retirement solely because he had sold his house to a black person"); *Liotta v. Nat'l Forge Co.*, 629 F.2d 903, 906-07 (3d Cir. 1980) (summary judgment inappropriate where material issues of fact remained regarding section 1981 claim brought by plaintiff who claimed he was discharged for supporting rights of African-American co-workers); *Fiedler v. Marumsco Christian Sch.*, 631 F.2d 1144, 1149 (4th Cir. 1980) (white student protected under section 1981 from retaliation by school because of her association with a black schoolmate); *Pinkard v. Pullman-Standard, a Div. of Pullman,*
(continued...)

As a result, it is clear that our decision in *Hart* cannot survive scrutiny under *Sullivan*, as expanded by the Court in *Jackson*. Moreover, our decision is out-of-step with the outcomes reached in the vast majority of cases outside of our circuit. Accordingly, we overrule our holding in *Hart* on this limited issue.[12] We now hold that a plaintiff may maintain a cause of action under section

---

[11] (...continued)

*Inc.*, 678 F.2d 1211, 1229 (5th Cir. Unit B 1982) (retaliatory discharge claim allowed under section 1981 where evidence showed plaintiff was discharged for lawful advocacy of minority and union rights); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000) (holding that it was clear under "well-settled" law that a plaintiff "need not have alleged discrimination based upon his race as an African American in order to satisfy the protected status requirement of his claims[,]" but rather plaintiff's advocacy on behalf of minorities was sufficient to allege retaliation under section 1981); *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1270 (6th Cir. 1977) (white plaintiff had standing under section 1981 for claim that employer fired him because he objected to discriminatory discharge of an African-American co-worker); *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1446-47 (10th Cir. 1988) (white employee fired for helping African-American co-worker file an EEOC claim could state a claim under section 1981); *see also Malhotra*, 885 F.2d at 1316 (Cudahy, J., concurring) (noting that "a white person who is discharged for espousing the rights of minorities could establish that the employer acted with discriminatory intent (as required to state a claim under section 1981); that the racial discrimination was directed at another, rather than directly at the plaintiff, is irrelevant, since it is the plaintiff who is suffering due to the employer's racial discrimination" and citing *Sullivan* and cases from other circuits in support).

[12] Because this opinion overrules a prior case, it has been circulated in advance of publication to all judges of this court in regular active service pursuant to Seventh Circuit Rule 40(e). A majority did not favor a rehearing en banc on the question of overruling *Hart*, 426 F.3d 863.

1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981. *See Jackson*, 544 U.S. at 179-80.

C.  Humphries Presented a Claim of Retaliation Sufficient to Survive Summary Judgment

Turning to the merits of Humphries's retaliation claim under section 1981, we generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981. *See, e.g.*, *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001) (applying same standard to Title VII and section 1981 discrimination claims); *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996) ("Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."); *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 568 (7th Cir. 1989) ("It is well settled that the methods and order of proof applicable to a claim of disparate treatment under Title VII are equally availing under § 1981."); *see also Patterson*, 491 U.S. at 186 (applying *McDonnell Douglas* framework to section 1981 claims). We see no reason to apply different requirements between the statutes with regard to retaliation claims. *See Foley*, 355 F.3d at 340 n.8 (approving of the same standard applied to retaliation claims under Title VII and section 1981); *see also Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1003-04 (7th Cir. 2005) (applying Title VII prima facie requirements to retaliation cases brought under the Energy Reorganization Act); *Larimer v. I.B.M. Corp.*, 370 F.3d 698, 702 (7th Cir. 2004) (applying Title VII prima facie requirements to retaliation claim under ERISA).

To overcome Cracker Barrel's motion for summary judgment, Humphries may proceed under either the

direct or indirect methods. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640 (7th Cir. 2002)). Under the direct method, Humphries must present direct evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Id.*; *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). Under the indirect method, he must show that after opposing the employer's discriminatory practice only he, and not any similarly situated employee who did not complain of discrimination, was subjected to a materially adverse action even though he was performing his job in a satisfactory manner. *See Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006); *White*, 126 S. Ct. at 2415. Thus, the indirect "method of establishing a prima facie case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily." *Sylvester,* 453 F.3d at 902.

Under the district court's view (which, naturally, Cracker Barrel echoes on appeal), Humphries's prima facie case failed because, among other reasons, he did not present sufficient evidence to meet the similarly situated requirement under the indirect method.[13] According to Cracker Barrel, similarly situated comparators *must* have the same supervisors, the same job duties, the same work performance histories, and must have engaged in the same bad conduct as the plaintiff. In other words, they must be essentially identical to the plaintiff, and, under Cracker Barrel's view, Humphries's two comparators, Stinnett and Dowd, fail that test.

---

[13] We need not decide whether Humphries has enough evidence under the direct method because he meets the requirements of the indirect method.

Cracker Barrel's view of our similarly situated require-
ment is too rigid and inflexible. This requirement "should
not be applied mechanically or inflexibly." *Hull v.
Stoughton Trailers, LLC*, 445 F.3d 949, 952 (7th Cir. 2006).
True, we have sometimes stated the similarly situated
requirement in the "must" terms that Cracker Barrel
argues, but a more sensitive reading of our cases indicates
that we have often stated that the similarly situated
requirement "*normally* entails a showing that the two
employees dealt with the same supervisor, were subject
to the same standards, and had engaged in similar con-
duct without such differentiating or mitigating circum-
stances as would distinguish their conduct or the em-
ployer's treatment of them." *Radue v. Kimberly-Clark
Corp.* 219 F.3d 612, 617-18 (7th Cir. 2000) (emphasis
added); *see also Keri v. Bd. of Trs. of Purdue Univ.*, 458
F.3d 620, 644 (7th Cir. 2006); *Ezell v. Potter*, 400 F.3d
1041, 1049-50 (7th Cir. 2005); *McDonald v. Vill. of
Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004); *Lucas v. Chi.
Transit Auth.*, 367 F.3d 714, 733 (7th Cir. 2004);
*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d
573, 580 (7th Cir. 2003); *Peters v. Renaissance Hotel
Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002); *Snipes v.
Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002); *Peele
v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002).
In other words, we have emphasized that the similarly
situated inquiry is a flexible one that considers "all
relevant factors, the number of which depends on the
context of the case." *Radue*, 219 F.3d at 617. "As to the
relevant factors, an employee need not show complete
identity in comparing himself to the better treated em-
ployee, but he must show substantial similarity." *Id.* at
618; *see also Goodwin v. Bd. of Trs. of Univ. of Ill.*, 442
F.3d 611, 619 (7th Cir. 2006); *Ezell*, 400 F.3d at 1050.

In addition, our case law does not provide any "magic
formula for determining whether someone is similarly

situated." *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001) (discussing the similarly situated requirement in the equal protection context). Instead, courts should apply a "common-sense" factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison? *Id.* (citing *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 382-83 (7th Cir. 2000) and *Radue*, 219 F.3d at 619). Put a different way, the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination. *See Hull*, 445 F.3d at 951-52.

It is important not to lose sight of the common-sense aspect of this inquiry. It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions. *See, e.g.*, *Ezell*, 400 F.3d at 1050. Now, it may be that the degree of similarity necessary may vary in accordance with the size of the potential comparator pool, as well as to the extent to which the plaintiff cherry-picks would-be comparators, *see Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 845-46 (7th Cir. 2006), but the fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless. In other words, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation—recall that the plaintiff need not *prove* anything at this stage.

Establishing a prima facie case should not be such an onerous requirement: "the plaintiff's evidence on the prima facie case need not be overwhelming or even destined to prevail; rather, the plaintiff need present only 'some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion.'" *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000) (quoting *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997) (also noting that the prima facie burdens "should not be applied rigidly")); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."). "The prima facie case, and specifically its fourth prong, are meant to identify situations where the 'actions taken by the employer, . . . if unexplained, are more likely than not based on consideration of impermissible factors.'" *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995) (quoting *Allen v. Diebold, Inc.*, 33 F.3d 674, 678 (6th Cir. 1994)). But the method of inquiry established by *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). After all, our intention in establishing the similarly situated requirement was to provide plaintiffs the "boost" that the *McDonnell Douglas* framework intended. *See Stone*, 281 F.3d at 643.

With this legal and policy backdrop in mind, we now turn to the would-be comparators in this case. It is clear that Stinnett was a sufficient comparator. He held the same associate manager position as Humphries, with the same duties, including responsibility for ensuring the safe was locked at all times. He shared the same supervisor (Dowd) and same ultimate decisionmaker (Christensen). Like Humphries, Stinnett had received past negative performance evaluations, including low ratings on "asset protection" categories. In addition, Humphries presented

competent testimony (both his own and that of a co-worker) that Stinnett—like Humphries—had used a so-called Gold Card to pay for a meal that a customer had complained about, apparently in contravention of Cracker Barrel policy. In addition, Humphries presented evidence that Stinnett's termination of Green (the immediate precursor event connected to Humphries's termination) was impermissible (under Cracker Barrel policy, only general managers, not associate managers, can fire employees). If anything, the record tends to suggest that Humphries generally performed slightly better than Stinnett. In addition, Humphries presented evidence that Stinnett also left the safe unlocked. Specifically, Humphries testified that Stinnett (and Dowd) routinely left the safe unlocked—the very basis for which Humphries was fired, and one which Humphries hotly disputes.

Cracker Barrel seeks to distinguish Stinnett on the grounds that he left the safe unlocked during the *daytime* (i.e., business hours) whereas Humphries left it unlocked during the *nighttime* (i.e., overnight). This is a distinction without much difference. Although arguments can be made as to relative greater potential harm of leaving the safe unlocked at night, the issue remains that it was contrary to Cracker Barrel policy to leave the safe unlocked and unattended at any point during the 24-hour day. More importantly, Cracker Barrel's argument here reflects precisely the type of formalistic argument that should not carry the day at summary judgment. Humphries was not required to show an identity of wrongful conduct: "the law is not this narrow." *Ezell*, 400 F.3d at 1050. It was enough to show "similar—not identical—conduct" and this surely qualifies under that standard. *Id.* To find otherwise is to lose sight of the big-picture, common-sense perspective. Thus, in terms of job titles, work duties, supervisor, and work performance histories, Stinnett and Humphries have more than suffi-

cient similarity. A single comparator will do; numerosity is not required.[14] *See, e.g.*, *Goodwin*, 442 F.3d at 619; *Ezell*, 400 F.3d at 1050.

Cracker Barrel also contends that it established that it had a legitimate reason for firing Humphries, and that Humphries failed to show that the reason that Cracker Barrel provided for his discharge was pretext (i.e., a lie). *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417-19 (7th Cir. 2006) (discussing general requirements to establish pretext). On these issues, we agree with the district court's determination that the record is replete with contested material facts pertaining to Humphries's work performance and the nature of Christensen's beliefs when he terminated Humphries. As an initial matter, Humphries contends that he did not leave the safe unattended, and the evidence implicating him is comprised solely of the testimony from Stinnett—the very individual Humphries targeted in his final complaint of discrimination. And there is testimony in the record that a co-worker observed Stinnett and Dowd acting differently (less deferentially) toward Humphries just prior to his firing, and that this co-worker specifically warned Humphries about Stinnett and Dowd because she believed that their behavior indicated that they were "up to something to harm Humphries." In addition, prior to firing Humphries, it appears that Christensen conducted no investigation into the veracity of Stinnett's claim. He did not interview Humphries; he simply credited Stinnett's story. Finally, the timing of Humphries's firing is suspicious: he was fired one week after he complained to Christensen about discriminatory practices and one day prior to a scheduled meeting with Dowd, which, presumably would have

---

[14] Because we conclude the Stinnett was an adequate comparator, we need not address whether Dowd fits the requisite criteria.

created a more elaborate (and less favorable to Cracker Barrel) documentary record of Humphries's complaints. Finally, there was evidence in the record tending to show that similar transgressions were not sufficient to fire other similarly situated employees who did not complain of discrimination. *See generally Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001) (holding that a showing that similarly situated employees were treated differently may be enough to establish pretext).

This is not to say that merely pointing to an employer's shoddy investigatory efforts is sufficient to establish pretext. Erroneous (but believed) reasons for terminating an employee are not tantamount to pretextual reasons. *See Forrester*, 453 F.3d at 419; *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012-13 (7th Cir. 2004). But, under the circumstances here, there was sufficient other circumstantial evidence in the record to support a reasonable inference that Humphries was "set-up" by Stinnett (in tandem with Dowd and Christensen), *see Sylvester*, 453 F.3d at 905, and that his purported bad act of leaving the safe unlocked was a fabrication to justify his firing. In this sense, the quality of Christensen's investigation may have some bearing on the truthfulness of Cracker Barrel's proferred reasons for terminating Humphries. In short, these are the sort of disputed factual issues that a jury should sort out.

As a final note, on remand, Humphries will have only his claim of retaliation. We agree with the district court's determination that he waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to Cracker Barrel's motion for summary judgment. Although Humphries did attempt to incorporate his well-developed arguments pertaining to the retaliation claim, and there is substantial overlap with regard to the prima facie requirements between the two claims, he did nothing more. On appeal,

however, Humphries addresses for the first time the issue of his replacement, and Cracker Barrel outlines a series of arguments as to why Humphries's reprimands and warnings do not constitute materially adverse employment actions. None of these arguments were reached by the district court nor flushed out in the briefing—this is precisely why we insist on parties raising all pertinent arguments below. Given that Humphries's core claim is one for retaliation, there is little inequity in applying our typical forfeiture rule to this particular claim.

## III.  CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of the defendant on Humphries's retaliation claim, we AFFIRM the grant of summary judgment in favor of the defendant on Humphries's discrimination claim, and we REMAND for further proceedings in accordance with this opinion.

EASTERBROOK, *Chief Judge*, dissenting in part.  The Supreme Court held in *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), that Title IX of the Education Amendments of 1972—which forbids educational programs that receive federal funds from discriminating on account of sex, 29 U.S.C. §1681(a)—allows the judiciary to define the word "discriminate." The Court used that authority to curtail steps that make reports of discrimination costly to students and employees. Today

this court attributes to *Jackson* the conclusion that *all* federal statutes dealing with the employment relation prohibit retaliation.

The Justices gave three principal reasons for their decision in *Jackson*. (1) The word "discrimination" has sufficient ambiguity to permit a reading that includes an anti-retaliation norm. 544 U.S. at 173-74. (2) Title IX was enacted in 1972, after anti-retaliation norms became common, making it sensible to resolve the ambiguity in favor of this reading. 544 U.S. at 176. (3) Lack of an anti-retaliation norm would make it too easy for educational programs to undermine the principal substantive rules in Title IX by getting rid of anyone who tried to enforce them. 544 U.S. at 180-81.

None of these reasons applies to 42 U.S.C. §1981, the subject of today's decision. (1) The word "discriminate" does not appear in §1981. What that statute provides is that all citizens have the same right to make and enforce contracts. How can a decision that resolves ambiguity in the word "discriminate" apply to other statutes with different language? (2) Section 1981 was enacted in 1866, long before anti-retaliation norms were created. The first mention of "retaliatory discharge" in any federal appellate opinion came in *NLRB v. Arthur Winer, Inc.*, 194 F.2d 370 (7th Cir. 1952), and the first use by the Supreme Court was *NLRB v. Scrivener*, 405 U.S. 117 (1972). (3) Lack of an anti-retaliation norm in §1981 would not hinder enforcement of civil rights laws, because there is a *real* anti-retaliation rule in Title VII of the Civil Rights Act of 1964. See 42 U.S.C. §2000e-3(a). That's one reason why *Jackson* distinguished Title IX of the 1972 Act from Title VII of the 1964 Act. 544 U.S. at 175. Cf. *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006) (holding that there is no general anti-retaliation doctrine under 42 U.S.C. §1983).

The question at issue today is not whether an employer may fire a worker who protested discrimination, but

whether an employee may present a claim of retaliation even though he failed to file a timely charge under Title VII and engage in conciliation before turning to court. By adding an anti-retaliation rule to §1981, the majority does not craft an ancillary doctrine necessary to make the principal norm work (as the Court did in *Jackson*); instead it demolishes components of Title VII that Congress thought necessary to expedite the resolution of disputes and resolve many of them out of court.

This is not the first time that a disgruntled employee has turned to §1981 after missing the deadline for litigation under Title VII. The Court held in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), that §1981 should be construed when possible to avoid conflict with Title VII. Today, however, the majority does exactly what *Patterson* forbids. It reads §1981 to have the same substantive content as Title VII, but without features such as short periods of limitations that employees find inconvenient. That's not a sound way to treat this statute, already extended far beyond its original meaning. See *Runyon v. McCrary*, 427 U.S. 160 (1976); Charles Fairman, VI *History of the Supreme Court of the United States: Reconstruction and Reunion 1864-88 (Part One)* 1207-60 (1971); Gerhard Casper, *Jones v. Mayer: Clio, Bemused and Confused Muse*, 1968 Sup. Ct. Rev. 89. *Patterson* holds that the process of judicial extension must stop.

Congress can add to a law's reach, and in 1991 it did so—but the 1991 revision does not mention "retaliation" or change the text of §1981(a), on which Humphries's claim rests. When §1981 and Title VII have different but overlapping provisions (as they do, for example, with respect to damages), then the judiciary must enforce both. See, e.g., *Branch v. Smith*, 538 U.S. 254, 273 (2003); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*, 534 U.S. 124, 141-44 (2001); *Randolph v. IMBS, Inc.*, 368 F.3d

726 (7th Cir. 2004). But the fact that overlapping systems may coexist does not justify *creating* incompatibility, as the majority does today. Section 1981 does not contain an anti-retaliation rule. When deciding whether to add such a rule to §1981, we must consider the effect that this step would have on Title VII. That's the holding of *Patterson*.

To the extent that my colleagues treat the 1991 legislation as discarding *all* of *Patterson*, they follow an approach that was rejected in *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994), and *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Legislation does not "overrule" decisions of the Supreme Court; new statutes adopt new rules but leave in place existing norms that the legislation does not touch. Nothing in the Civil Rights Act of 1991 justifies reading §1981 more broadly than its (amended) text or undermining parts of Title VII that remain in force. The Court demonstrated this in *Domino's Pizza, Inc. v. McDonald*, 126 S. Ct. 1246 (2006), which unanimously reversed a decision that had invoked the judges' views of wise public policy to extend §1981. *Domino's Pizza* shows that *Patterson* cannot be treated as defunct. The Supreme Court has cited *Patterson* favorably in 24 decisions since *Landgraf* and *Rivers*. Of these, *Domino's Pizza* is the most salient because it uses *Patterson*'s interpretive methodology to construe §1981 as amended by the Civil Rights Act of 1991.

My colleagues end up declaring that the text of §1981, its context, its history (the absence of anything like an anti-retaliation norm in 1866), its function, and the effect of an inventive reading on the operation of Title VII all are irrelevant. The rule they impute to *Jackson* has no moorings in any statute's text or provenance. Yet that's not at all what *Jackson* says; it dealt with the actual language and operation of Title IX and does not justify a language-and-history-free interpretation of all federal statutes. I do

not think it likely that the Supreme Court, which insists that statutory language be followed even if inconvenient or jarring—see, e.g., *Arlington Central School District v. Murphy*, 126 S. Ct. 2455, 2463 (2006); *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S. Ct. 2611, 2625-27 (2005); *Dodd v. United States*, 545 U.S. 353 (2005); *Tyler v. Cain*, 533 U.S. 656, 663 n.5 (2001)—would accept such an atextual approach. I appreciate the temptation to make every law "the best it can be," but that is not the Supreme Court's current mode of statutory interpretation, as *Domino's Pizza* shows for §1981 in particular.

Perhaps it *was* the approach that prevailed in 1969, when the Court decided *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969). The majority in *Sullivan* held that a plaintiff in litigation under 42 U.S.C. §1982 has standing to complain about retaliation, and *Jackson* concluded that it must have had a substantive component too. So read, *Sullivan* is of a piece with other decisions holding that judges may supplement statutes to make them "more effective." See, e.g., *J.I. Case Co. v. Borak*, 377 U.S. 426 (1964). But *Cort v. Ash*, 422 U.S. 66 (1975), abandoned that approach, and since the 1970s the Court has lashed interpretation more closely to statutory text. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (emphasis in original).

It is anachronistic to say that, because *Sullivan* engaged in a freewheeling "interpretation" of §1982, we may today take liberties with §1981. One might as well cite *Borak* for the proposition that "every right implies a remedy" so

that courts should today create a private right of action for every statute other than those that the Supreme Court addressed in *Cort* and its successors.

Yet that is the majority's tack. The argument goes that, because *Sullivan* ignored the language of §1982 and drafted an "improved" version of the statute, we are free to do the same today for §1981, its neighbor. The Supreme Court requires us to proceed otherwise. *Borak* dealt with §14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78n(a). It was as freewheeling in "interpreting" that law as *Sullivan* was with §1982. Yet the Court has held that the change of interpretive method announced in *Cort* applies to all other sections of the Securities Exchange Act. See *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1 (1977) (§14(e)); *Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) (§17(a)). *Borak* and similar decisions from the 1960s have not been overruled, but we have been told in no uncertain terms that they must not be extended. Indeed, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), the Court declined to apply *Borak* to a portion of §14(a) that had not been involved in *Borak*. So that case has been limited to a single sentence of one subsection. Why, then, may the method of *Sullivan* be applied to other sections of the Civil Rights Act of 1866 despite intervening precedent?

There has been a sea change in interpretive method between *Sullivan* and today—and *Patterson* not only exemplifies the change but also applies it to §1981. In 1989 the Justices were invited to rely on *Sullivan* as a model for the interpretation of §1981. They declined. Less than a year ago, in *Domino's Pizza*, the Court reiterated *Patterson*'s interpretive stance. *Sullivan*, by contrast, did not receive a mention. Yet my colleagues do not mention *Domino's Pizza*. Why bypass the Supreme Court's 2005 understanding of §1981 in favor of a 1969 understand-

ing of §1982? We must respect our superiors' decision to call a halt to judicial extrapolation; *Domino's Pizza* rather than *Sullivan* exemplifies the appropriate judicial role. By relying on *Sullivan*, my colleagues indulge an assumption—that if some remedies are good, then more must be better—that has no support on today's Supreme Court.

Now if §1981 had been enacted while the freewheeling approach of *Sullivan* was in force, it might well be appropriate to adopt a goal-driven reading. To use the interpretive tools of the last 30 years to unravel a statute passed in earlier days would be to cross up the legislature. That was a point the Court made in *Jackson*: Title IX was enacted in 1972, and Congress may well have anticipated that *Sullivan*-like construction would follow. 544 U.S. at 176. The legislators who voted for §1981 in 1866 would not have anticipated any such judicial liberties, however; and when §1981 was amended in 1991, decisions such as *Cort* and *Rodriguez* and *Patterson* had announced a textual approach. So when a question arises in 2006 about the meaning of this 1866/1991 legislation, our job is to apply the interpretive norms that prevailed in 1866, 1991, and today, not to take an ambiguous decision from 1969 and see how far we can run with it.

Section 1981 does offer one opening for a claim in the nature of retaliatory discharge. Suppose Cracker Barrel regularly fired black employees who protest discrimination in the workplace, but not protesting white employees. Then it might be appropriate to conclude that black persons do not enjoy the same right as white persons to contract with Cracker Barrel. But Humphries does not make such an argument. For all this record shows, Cracker Barrel fires every complainer, without regard to the subject of the complaint. An employer that treats everyone the same in this respect complies with §1981, so the judgment should be affirmed.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*